**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Penn Square Bank, N.A., Plaintiff-Appellee,**

v.

**BANK OF SAN FRANCISCO, Defendant-Appellant.**

No. 86–1948.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1987.

Decided May 21, 1987.

---

Dennis F. Shanagher, San Francisco, Cal., for the plaintiff-appellee.

Lynne Bantle, San Francisco, Cal., for the defendant-appellant.

Before JOHN T. NOONAN, Jr. and O'SCANNLAIN, Circuit Judges, and STOTLER,* District Judge.

NOONAN, Circuit Judge:

Bank of San Francisco (the Bank) appeals from summary judgment in favor of the Federal Deposit Insurance Corporation (FDIC) on a letter of credit. Jurisdiction exists under 12 U.S.C. § 1819. We affirm.

### FACTS

On December 12, 1980 the Bank issued a standby letter of credit in the amount of $50,000. The letter was issued at the request of Arthur J. Shartsis and Mary Jo Shartsis (the Customers). It was issued in favor of Penn Square Bank (Penn Square) and was intended to be security for an

---

* Honorable Alicemarie H. Stotler, United States District Judge, Central District of California, sitting by designation.

investment made by the Customers in Longhorn Developmental Program, Ltd., a partnership in oil and gas managed by Longhorn Oil and Gas Company (Longhorn).

The letter in its entirety read as follows:

December 24, 1980

Penn Square Bank, N.A.

1919 Penn Square

Oklahoma City, Oklahoma 73118

Re: Irrevocable Letter of Credit No. 10006–TBSF

Gentlemen:

We hereby establish our Irrevocable Letter of Credit No. 10006–TBSF in your favor for the account of Arthur J. Shartsis and Mary Jo Shartsis for an amount not to exceed U.S. $50,000.00, available by your draft at sight, drawn on The Bank of San Francisco, San Francisco, California, accompanied by the following documents:

1. An affidavit executed by you or any transferee that any payment due under a Promissory Note negotiated and executed by Longhorn Developmental Program, Ltd., an Oklahoma limited partnership, on behalf of the investor, Arthur J. Shartsis and Mary Jo Shartsis, has not been paid and is in default in accordance with the terms of this Note.

2. The related Note endorsed without recourse to our order must accompany your drawing.

The entire amount of this credit is available to you from the date of this letter through December 31, 1982.

Very truly yours,

THE BANK OF SAN FRANCISCO

By: _____

 Steven L. Shepherd
 Vice President

Unless otherwise instructed, documents will be forwarded to us in one airmail letter by the negotiating bank. The credit will be subject to the Uniform Customs and practice for Documentary Credits (1974 Revision), the International Chamber of Commerce Publication No. 290.

On March 5, 1981 at the request of Longhorn the Bank deleted paragraph 2.

The FDIC became the receiver of Penn Square on July 5, 1982. On August 17, 1982 the FDIC requested the Bank to pay the letter of credit. On August 19, 1982 the Customers advised the Bank in writing that Penn Square "was directly involved in a fraudulent scheme" to procure the letter of credit "in connection with the Longhorn Oil and Gas Drilling Program, of which at least one officer and one director of the Penn Square Bank had a substantial interest." The Customers asked the Bank to dishonor the draft. On August 23, 1982 the Bank wrote FDIC pointing out that the FDIC had not furnished the affidavit required by the letter and requesting the FDIC to execute the affidavit. On August 24, 1982 the Customers obtained a temporary restraining order against the Bank honoring the draft. On August 25, 1982 the Bank wrote the FDIC stating, "The Bank stands ready to honor its obligation under the Letter of Credit at such time as the Temporary Restraining Order is removed and an Affidavit containing the provisions discussed below [the provisions of the letter of credit] are received by the Bank."

On October 15, 1982 the Customers were denied a preliminary injunction and on November 30, 1982 the temporary restraining order expired by its terms. On December 10, 1982 the FDIC presented to the Bank a sight draft for $50,000 drawn on the letter of credit and accompanied by an affidavit apparently complying with the terms of the letter. On December 15, 1982 the Bank notified the FDIC that it would not honor the draft. The Bank stated that its decision was based on:

1. Allegations made by the Bank's customer to the effect that the subject Letter of Credit was procured by fraudulent means; and

2. Apparent inconsistencies between the underlying Promissory Note and the Affidavit submitted by the Federal Deposit Insurance Corporation in support of its demand.

This suit followed.

### The Summary Judgment Motions

The Bank, as it puts the matter on appeal, "placed its decision to dishonor the

Credit in the context of on going multi-district litigation," in which the Customers were "only two of many Longhorn investors complaining of fraud in connection with the procurement of Letters of Credit." At the time of dishonoring the draft the Bank had relied on the verified complaint of the Customers against Penn Square and their supporting affidavits detailing fraud by Penn Square and Longhorn. Before the district court in this case the Bank presented documentary evidence obtained in that litigation which, the Bank contended, showed Penn Square's participation in fraud by Longhorn on the Customers. On cross-motions for summary judgment the district court granted the motion of the FDIC finding that the Bank had failed to show fraud in either the underlying transaction or in the presentment. The Bank raised a second defense that the documents presented did not conform to the requirements of the letter of credit. On a second motion for summary judgment by the FDIC on this issue, the Bank lost again. It appealed on both issues to this court.

### ANALYSIS

■ Federal law governs the case. A suit brought by the FDIC arises "under the laws of the United States." 12 U.S.C. § 1819. The liability of the Bank consequently "involves decision of a federal, not a state, question." *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 456, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942). We make "specialized federal common law," Friendly, "In Praise of *Erie*—And of the New Federal Common Law", 39 *N.Y.U.L.Rev.* 383, 406 (1964). Doing so, we have an option: we may adopt the law of the state involved, *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979), *and see* Mishkin, "The Variousness of Federal Law: Competence and Direction in the Choice", 105 *U.Pa.L.Rev.* 797, 834 (1957); or we may draw on the federal law merchant as "a convenient source of reference." *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). Either way, we act as a federal court making federal law. *D'Oench*, 315 U.S. at 465, 62

S.Ct. at 682 (concurring opinion); *cf. United States v. Ellis*, 714 F.2d 953, 955 (9th Cir.1983). Either way, we reach the same result here, and our interpretation of the Uniform Commercial Code that follows may be read as alternatively an interpretation of state law adopted by us as federal law or a statement of the federal law merchant as it governs letters of credit sued on by the FDIC.

*D'Oench* itself treated the FDIC as a holder in due course of a note whose maker had a secret understanding with the payee bank that the note would not be enforced. The note was on the bank's books, fraudulently inflating its assets. When the FDIC became the bank's receiver, it was permitted to enforce the note as a holder in due course. While the case could be analyzed, as the concurrence of Justice Frankfurter does, *id.*, 315 U.S. at 463, 62 S.Ct. at 682, as equitable estoppel against the maker, the principal rationale of the decision is protection of the FDIC. *Id.* at 456, 62 S.Ct. at 679.

The Bank objects that *D'Oench* has already been held inapplicable in a suit brought against the FDIC as the Penn Square receiver by persons defrauded by Penn Square in connection with Longhorn. *In re Longhorn Securities Litigation*, 573 F.Supp. 278 (W.D.Okla.1983). The Bank also objects that this circuit has read *D'Oench* as based on equitable estoppel and will not apply it when the person sued by the FDIC is not a party to a fraud but an innocent victim of fraud perpetrated by the bank the FDIC has taken over. *FDIC v. Meo*, 505 F.2d 790 (9th Cir.1974).

■ Neither of these cases is precedent here because we deal with a letter of credit and only a letter of credit. A letter of credit is an instrument of commerce and finance which is sui generis. It issues by virtue of a contract between a bank and its customer. It becomes an engagement of the issuer to the beneficiary who accepts it. Harfield, *Letters of Credit* (1979) 9, 12. The assurance of payment thereby given the beneficiary has made letters of credit central in the sale of goods when buyer and

seller are at a distance and has made letters of credit a popular form of guaranteeing investments. Outstanding standby letters of credit issued by banks in the United States amounted, in June 1985, to $153.2 billion. Federal Reserve Bank of San Francisco, *Winter 1986 Economic Review,* 20. Law affecting such an essential instrument of the economy must be shaped with sensitivity to its special characteristics.

■ The Bank refused to honor the draft on the letter of credit it had issued because it had notice of fraud in the transaction between its Customers and Longhorn and notice that Penn Square was a party to the fraud. Both parties invoke the Uniform Commercial Code as adopted by California in Commercial Code § 5114(2)(a) and (b).

The Bank reads the Code to create an option in an issuer to honor or dishonor a draft under certain circumstances. The relevant sections provide:

(2) Unless otherwise agreed, when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation for transfer of a document of title ... or of a security ... or is forged or fraudulent or there is fraud in the transaction, (a) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course ...

(b) In all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents.

For the Bank to prevail, however, the terms "fraud in the transaction" must mean "fraud in the underlying transaction," that is, fraud in the transaction between the customer and beneficiary that leads the customer to request the bank to issue the letter of credit. Such an interpretation undermines the institution of letters of credit; it invites uncertainty and litiga-

tion in the place of assured payment. It is open to us to reject such a result and confine "fraud in the transaction" to "fraud in the presentation of the required documents." Anderson, *Uniform Commercial Code* (1985) § 5-114, 17.

■ If the case were one where a beneficiary who had defrauded a customer was itself seeking to draw on the letter of credit, a court might be tempted to yield to the "more pliable precepts of equity" and distort "the rigid rules that govern letters of credit." Harfield, "Identity Crisis in Letter of Credit Law," 24 Ariz.L.Rev. 239 (1983). But that is not our case. Here the FDIC has stepped in, innocent of any involvement in Penn Square's squalid schemes.

If equity inclined the court in *Meo* to prefer the innocent note-maker to the FDIC, here a sense of the structure of a letter of credit impels us to prefer the FDIC. *See Andy Marine v. Zidell,* 812 F.2d 534, 537 (9th Cir.1987) ("it defeats the whole purpose of a letter of credit to examine the rights and wrongs of a contract dispute to determine whether the letter should be paid"). Where national banks are concerned, the Comptroller of the Currency has specified that "as a matter of sound banking policy" the issuer "must not be called upon to determine questions of fact or law between the account party and the beneficiary." 12 C.F.R. § 7.7016. What is sound banking policy for a national bank is here sound federal law.

The letter of credit was an asset of Penn Square, the bank the FDIC insured; it was security for a loan made by Penn Square to the partnership in which the Customers were limited partners. To permit that bank's fraud to deprive the FDIC of the asset would be to reduce the protection that federal policy gives the FDIC "in its various functions." *D'Oench,* 315 U.S. at 461, 62 S.Ct. at 681. In view of the comprehensive utility of letters of credit, no federal court should reduce the FDIC's protection in this area. As a matter of federal law, we hold that where the FDIC has become the beneficiary of a letter of credit, the issuer may not dishonor a draft for

fraud outside the documents required by the letter.

 The Bank, however, claims that there was fraud in the documents or at least that the documents presented failed to conform with those required by the letter. The Bank maintains that the promissory note required by the letter of credit never existed—that the Customers had shown that no promissory note was ever executed on their behalf. Hence, the affidavit required by the letter of credit and specifically requested by the Bank on August 25, 1982 could not have been honestly furnished by the FDIC; for there was no promissory note on behalf of the Customers that could be in default.

What was in default was a promissory note for $10 million executed December 30, 1980 by Longhorn Developmental Program, Ltd., a limited partnership, in favor of Penn Square. This note bound all of the parties, including the Customers. A note executed on the Customers' behalf as partners was in default. There was no separate note for $50,000 executed on behalf of the Customers.

The letter of credit as originally issued on December 24, 1980 did not contemplate that the $10 million note of the Longhorn partnership would be "endorsed without recourse" to the Bank when Penn Square drew on the letter. Clearly "the related Note" specified by paragraph 2 of the letter was a $50,000 note presumably to be executed on behalf of the Customers, a note that was in fact never executed. When paragraph 2 was excised on March 5, 1981, its removal did not change the meaning of paragraph 1. The FDIC's affidavit complied with the condition specified. The Bank was bound to honor the draft.

**AFFIRMED.**