12 F.3d 1485
 62 USLW 2373, 23 UCC Rep.Serv.2d 150
 Patrick J. MURPHY, et al., Plaintiffs-Appellees,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, et al.,
Defendants-Appellants.
Patrick J. MURPHY, an Individual; Murphy's Markets, Inc., a
California Corporation; Ramsey Marketing and Management Co.
("Ramco"); aka Ramsay Marketing and Management Co., a
California Corporation, Plaintiffs-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, et al., Defendants-Appellees.
FEDERAL DEPOSIT INSURANCE CORPORATION; First National Bank,
Plaintiffs-Appellees,
v.
Patrick J. MURPHY, Defendant-Appellant.
 Nos. 91-15511, 91-15640 and 91-15642.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 14, 1992.
Decided Dec. 10, 1993.
 
 William A. Norris, Circuit Judge, dissented and filed opinion.
 E. Whitney Drake, F.D.I.C., Washington, DC, Patrick J. Hogan and John D. O'Connor, Tarkington, O'Connor & O'Neill, San Francisco, CA, for F.D.I.C.
 John F. Wells, Stark, Wells, Rahl, Field & Schwartz, Oakland, CA, and William C. Rust, Jr., San Francisco, CA, for Murphy.
 Appeal from the United States District Court for the Northern District of California.
 Before: SCHROEDER, NORRIS, and BRUNETTI, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 This is a dispute between the Federal Deposit Insurance Corporation and Patrick J. Murphy, the holder of two letters of credit issued by a failed bank, The First National Bank, Chico. Mr. Murphy was an investor in the parent company of the bank, Pacific National Bancshares ("PNB"), and had also served as one of PNB's directors. The Bank issued the letters of credit as security for the obligations of PNB to Murphy.
 
 
 2
 In this litigation, Murphy sought to enforce the letters of credit against the FDIC in its corporate capacity as assignee of the assets and liabilities of the bank. The FDIC defended on the ground that it was not responsible for obligations of the Bank that were not properly carried on its books and records, relying upon the doctrine of D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its partial codification in 12 U.S.C. Sec. 1823(e). The FDIC also contended that it was not responsible for the Bank's obligations that violated federal statutes prohibiting inadequately secured credit transactions between the Bank and affiliate entities. See 12 U.S.C. Secs. 371c(c), 375b. The district court, relying upon our decision in First Empire Bank v. FDIC, 572 F.2d 1361 (9th Cir.), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978), ruled that the FDIC had to honor its obligations to Murphy on the letters of credit. The district court denied the FDIC's motion for summary judgment, tried the issues of breach of contract and fraud to the jury, and entered judgment on the jury's verdict in favor of Murphy. The court's judgment required the FDIC to honor the letters of credit and to pay Murphy a ratable share of the Bank's assets pursuant to 12 U.S.C. Secs. 91, 194 and First Empire. The FDIC appeals.
 
 
 3
 The district court denied Murphy's post-trial motion challenging the award of only a ratable share and contending that he was entitled to a dollar for dollar setoff against his obligation to the FDIC on a separate loan transaction. Murphy cross-appeals.
 
 
 4
 In First Empire, supra, creditors of a failed bank sued to enforce their claims against the FDIC as Receiver of the failed bank. This court ruled in favor of the creditors against the FDIC, holding that the creditors were entitled to a ratable dividend under the National Banking Act, 12 U.S.C. Secs. 91, 194. The test employed by the court was whether or not the Bank's liability on the claim had accrued and was unconditionally fixed at the date of insolvency. This court found that the letters of credit were in existence before insolvency and were not dependent on any new contractual obligations arising after insolvency, and so ruled for the creditors.
 
 
 5
 In contrast to the facts of this case, however, the First Empire letters of credit involved no irregularities in the manner in which the obligations were carried on the books and records of the bank, nor were they issued in connection with any transactions that violated federal banking statutes. In this case, both parties stipulated that "[t]he letters were not carried on the books of accounts, accounting records or ledgers of FNB as liabilities of the bank, contingent or otherwise, as of March of 1986. The letters are referred to in the financial statements of the year ended December 31, 1985." These letters of credit were issued as a result of the Bank's extending credit to its parent company without the security required by federal banking statutes. The issues in this case concerning the enforceability of a letter of credit in these circumstances are issues of first impression in this circuit.
 
 
 6
 We hold that these letters of credit are not enforceable against the FDIC because they were not reflected in the Bank's books and records and lacked the collateral legally required under the banking statutes. We therefore do not reach the remaining issues in the FDIC's appeal or Murphy's cross-appeal.
 
 BACKGROUND
 
 7
 The story begins in 1982 when Frederick L. Hilger, Sr. organized Pacific National Bancshares as a holding company in order to acquire, for $3,000,000, First National Bank, Chico. Patrick Murphy was one of the initial group that Hilger persuaded to invest in the holding company, PNB. Investors contributed $750,000; PNB borrowed the remaining $2,250,000 from Security Pacific National Bank. Murphy contributed $83,000 to the investment, agreed to be a guarantor of the Security Pacific loan, and became a director of both the Bank and PNB.
 
 
 8
 About eighteen months later, in July of 1984, Murphy resigned from the directorships and sold his stock in PNB back to the company for the ostensible price of $400,000. The transaction, effected on PNB's behalf by Hilger, consisted of the payment to Murphy of $5,000 in cash and PNB's promissory note for the remaining $395,000. The note, in turn, was secured by a letter of credit issued by the Bank, referred to in these proceedings as the 1984 letter. Because the letter of credit was issued to secure the obligations of the Bank's holding company, federal law required that there be collateral for any letter of credit issued by the Bank on behalf of any affiliate. 12 U.S.C. Sec. 371c(c)(1).[1] PNB provided no collateral for the letter of credit. The FDIC also relies on 12 U.S.C. Sec. 375b, which prohibits loans or extensions of credit to directors and controlling shareholders. The parties disagree about whether Murphy was still a director when he received the letter of credit. We do not reach this question, however, because the violations of 12 U.S.C. Sec. 371c(c) are sufficient to prevent Murphy from collecting from the FDIC.
 
 
 9
 In March of 1985 an audit criticized the bank for unlawful extensions of credit to directors and officers. In June of 1985 the Office of the Comptroller of the Currency issued a Cease and Desist Order based on a determination that violations of law and sound banking practices threatened the bank's financial soundness. The order included a prohibition against extending credit to affiliates without OCC review.
 
 
 10
 In October, 1985, Murphy loaned $190,000 to PNB so that PNB could pay the next installment of its loan to Security Pacific. Murphy remained as a guarantor of the Security Pacific loan. The transaction was similar to the 1984 letter of credit transaction in that PNB gave Murphy promissory notes for $190,000 and the Bank issued a letter of credit on behalf of PNB to Murphy for $190,000. PNB provided the Bank with no collateral for this letter of credit.
 
 
 11
 In addition, the letters of credit, and, of course, the lack of collateral for their issuance, were not approved by the Board of Directors of the Bank, nor were they carried on the regular books and records of the Bank. This is significant to this case because under a line of authority beginning with the Supreme Court's decision in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and partially codified in 12 U.S.C. Sec. 1823, the FDIC is afforded certain protections from liability on obligations that are not properly documented in a bank's records.
 
 
 12
 A year later, in October, 1986, PNB defaulted on its payments to Security Pacific, and by November 20, 1986, FDIC had been appointed as Receiver. Hilger was later convicted of fraud violations in connection with his handling of PNB and the Bank. After PNB defaulted on the note payments to Murphy in January, 1986, his demands to PNB and the Bank on the letters of credit were not honored. He then filed claims with the FDIC; these were denied.
 
 
 13
 Murphy's suit in the United States District Court for the Northern District of California in April, 1988, resulted in the judgment entered in his favor after a jury trial, from which the FDIC now appeals.
 
 DISCUSSION
 
 14
 Murphy's position at all times in this litigation is that he is the bona fide holder of letters of credit that the FDIC must honor. He maintains that so long as proper presentment was made,[2] the FDIC as Receiver can avoid the obligation of the bank only if Murphy was in pari delicto with Hilger in a scheme to defraud. Because the jury exonerated Murphy of fraud, he contends that he correctly prevailed in the district court.
 
 
 15
 Murphy's position persuaded the district court, for it embodies two unassailable principles well grounded in our law.
 
 
 16
 The first is that letters of credit, by their very nature, represent an obligation of the issuing bank independent of the relationship between the bank's customer, who asked that the letter of credit be issued, and the beneficiary of the letter of credit. This is true of the type of letter of credit at issue in this case, the standby letter of credit, as well as more traditional commercial letters of credit. While a commercial letter of credit facilitates the sale of goods, a standby letter of credit guarantees that a bank's customers will perform their underlying financial obligations. "The principal difference between the traditional letter of credit and these newer standby letters is that 'whereas in the classical setting, the letter of credit contemplates payment upon performance, the standby credit contemplates payment upon failure to perform.' " First Empire, 572 F.2d at 1367 (citations omitted). Because letters of credit stand as independent financial obligations, the general rule on standby letters of credit is that they must be honored upon presentment of the proper documents. See Andy Marine Inc. v. Zidell, Inc., 812 F.2d 534, 536 (9th Cir.1987). As we noted in FDIC v. Bank of San Francisco, 817 F.2d 1395, 1398 (9th Cir.1987), "A letter of credit is an instrument of commerce and finance which is sui generis." Thus, any defenses that may arise in connection with the underlying transaction between the customer and the beneficiary should not be asserted by the bank when asked to pay the letter of credit.
 
 
 17
 The second principle is that announced by the First Empire decision itself. The FDIC as Receiver must treat the bank's obligations on letters of credit in the same manner it treats its obligations to all creditors. The FDIC was required to comply with the provisions of the National Bank Act, 12 U.S.C. Secs. 91, 194, and to honor claims that had accrued and were unconditionally fixed at the date of insolvency. 572 F.2d at 1367. Murphy insists that the FDIC is so obligated here.
 
 
 18
 The difficulty with Murphy's position is that it essentially asks us to overlook the flawed, concealed and unlawful banking practices that brought about these letters of credit. The legality of the First Empire letters was not challenged. See id. The FDIC asks us to look to the rapidly expanding authority aimed at protecting the assets of failed banking institutions from depletion by claims and apparent defenses that do not appear on the books and records of the bank. As a threshold position the FDIC asks us to give a broad brush of approval to the principle that the FDIC as Receiver should not have to honor any claims that do not appear on the books and records of the failed bank.
 
 
 19
 The FDIC's position has its origins in the D'Oench, Duhme case, supra. The FDIC argues that it is not bound by side agreements not reflected in the bank's records. The D'Oench doctrine and Sec. 1823(e) protect the FDIC from claims not listed in a bank's records; the FDIC is allowed to rely on the bank's records when it takes over insolvent banks, and is protected from unrecorded claims against it. Section 1823(e) states that:
 
 
 20
 No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section shall be valid against the Corporation unless such agreement--
 
 
 21
 (1) is in writing,
 
 
 22
 (2) was executed by the depository institution ... contemporaneously with the acquisition of the asset by the depository institution,
 
 
 23
 (3) was approved by the board of directors ... which approval shall be reflected in the minutes of said board or committee, and
 
 
 24
 (4) has been, continuously, from the time of its execution, an official record of the depository institution.
 
 
 25
 12 U.S.C. Sec. 1823(e).
 
 
 26
 The original stated purpose of the D'Oench doctrine and Sec. 1823(e) was to allow federal and state bank examiners to rely on a bank's records when they evaluate a bank's assets. Another purpose is to encourage banks to undertake thorough consideration of unusual loan transactions and to prevent fraudulent transactions. Langley v. FDIC, 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987); see also FDIC v. Zook Bros. Const. Co., 973 F.2d 1448, 1451 (9th Cir.1992). Initially, D'Oench was read to bar affirmative defenses based on secret agreements by parties sued by the FDIC. In FSLIC v. Gemini Management, 921 F.2d 241 (9th Cir.1990), this court expanded the range of D'Oench's application. Gemini Management raised a secret agreement as a defense and as a counterclaim against the FSLIC. The court noted the urgency of the savings and loan crisis, and supported a broad application of D'Oench, not only to defenses but to counterclaims as well.
 
 
 27
 The Gemini court also took a broad reading of the secret agreement requirement of D'Oench. Gemini argued that the agreement in question was not secret, but the court found that a letter in the files with incomplete information was not enough to defeat the D'Oench doctrine. "We believe D'Oench and its progeny require a clear and explicit written obligation." 921 F.2d at 245; see also FSLIC v. Two Rivers Assocs., Inc., 880 F.2d 1267, 1276 (11th Cir.1989).
 
 
 28
 The key language in D'Oench and its progeny is that a party "lend himself" to the scheme or arrangement by which the banking authority was likely to be misled. Knowledge is not required. This aspect of D'Oench is highlighted in recent cases which emphasize the likelihood of the transaction to deceive the FDIC rather than the conduct of the affected investor. See, e.g., In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332 (1st Cir.1992).
 
 
 29
 The D'Oench, Duhme equitable doctrine and Sec. 1823(e) are often dealt with interchangeably, but they are not identical. See, e.g., FDIC v. McClanahan, 795 F.2d 512, 514-16 (5th Cir.1986); Agri Export Co-op v. Universal Sav. Ass'n, 767 F.Supp. 824, 834 (S.D.Tex.1991). The language of Sec. 1823(e), quoted above, is much more specific than D'Oench about the requirements of writing: agreements affecting assets must be approved by the board of directors and carried officially on the records of the depository institution. "[I]n the application of the statute, the borrower's conduct or participation in a scheme to deceive the insurer is not at issue. In contrast, the D'Oench, Duhme doctrine is a rule of equitable estoppel and, therefore, applies to any defense a borrower may assert in which the borrower participated in a scheme which tends to deceive the insurer. 'The test is whether the note was designed to deceive the creditors or the public authority or would tend to have that effect.' Thus, the statute expands D'Oench, Duhme in that it applies to any agreement, whether or not it was 'secret,' and regardless of the maker's participation in a scheme. At the same time, however, the statute is narrower than D'Oench, Duhme in that it applies only to agreements, and not to other defenses the borrower might raise." Marsha Hymanson, Borrower Beware: D'Oench, Duhme and Section 1823 Overprotect the Insurer When Banks Fail, 62 S.Cal.L.Rev. 253, 271-72 (1988) (footnotes omitted). Section 1823 is a statutory mandate that stands independent of the D'Oench, Duhme common law equitable underpinnings. They are both the subject of an increasing volume of litigation in recent years as the courts struggle with the aftermath of the crash of highflying financial institutions of the 1980s.
 
 
 30
 Murphy contends the D'Oench doctrine does not apply in this case. As he points out, this Circuit nearly twenty years ago recognized an innocence exception to D'Oench, in FDIC v. Meo, 505 F.2d 790 (9th Cir.1974). Meo was a bona fide purchaser of stock who had given a promissory note to the bank, but had not received the proper stock certificates. We overruled the district court's judgment in favor of the FDIC on the note and the district court's refusal to recognize an undisclosed defense of failure of consideration in the case under D'Oench. We termed Meo a "completely innocent party," and we concluded "that a bank borrower who was neither a party to any deceptive scheme involving, nor negligent with respect to, circumstances giving rise to the claimed defense to his note is not estopped from asserting such defense against the bank's receiver." Id. at 792-93.
 
 
 31
 In re Century Centre Partners, Ltd. v. FDIC, 969 F.2d 835, 839 (9th Cir.1992), limits the Meo exception, stating that Meo must be read in light of the D'Oench rationale of protecting depositors and creditors. In Century Centre, the party could have investigated the entire transaction before signing the papers; since he did not investigate, he "lent himself" to the scheme and so was barred by D'Oench. Id.
 
 
 32
 Some circuits have rejected the Meo innocence defense, arguing that it does not survive the Supreme Court decision in Langley, which barred misrepresentation as a defense under D'Oench and Sec. 1823(e). See, e.g., Baumann v. Savers Fed. Sav. & Loan Ass'n, 934 F.2d 1506, 1516 (11th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992); In re 604 Columbus Ave. Realty Trust, 968 F.2d at 1347. This circuit recently expressly declined to decide this question post-Langley. FDIC v. Zook Bros. Const., 973 F.2d at 1452. We do not decide the question either, because we hold that the Meo defense would not apply in the circumstances of this case in any event.
 
 
 33
 This case presents issues of first impression because neither the Supreme Court nor this court has been called upon to determine whether, or in what circumstances, the FDIC can refuse to honor letters of credit by relying upon both Sec. 1823(e) and regulatory banking statutes. In resolving these issues, it is important to bear in mind that the defenses that the FDIC asks us to interpose to these letters of credit are not based upon the relationship between the customer (PNB) and the beneficiary (Murphy). See FDIC v. Bank of San Francisco, 817 F.2d at 1399 (fraud in the underlying transaction between customer and beneficiary does not justify non-payment of letter of credit). The principle of independence precludes either the bank or the FDIC from asserting the latter defenses for a claim on a letter of credit. Rather, the FDIC's defenses are based on both irregularities in the Bank's books and records and on illegalities in the banking transactions that made the letter of credit possible. We therefore need not accept the FDIC's broadest contention, that it need not honor any transaction that is not carried on the records of the bank as described in Sec. 1823(e). We agree with those authorities that have observed that insubstantial irregularities in the books and records provide no defense to the FDIC or federal institutions performing a similar function. See, e.g., Agri Export, 767 F.Supp. at 834 (RTC could not avoid payment on an otherwise valid letter of credit that involved no side agreement pertaining to a particular asset).
 
 
 34
 In this case, the Bank violated a federal statute aimed at preventing the extension of credit to affiliates without collateral. Not only was the letter of credit itself not carried on the books, but the lack of collateral, in violation of statutory requirements, was concealed as well. If PNB had given collateral to the Bank as security for the issuance of the letters of credit and had made a secret agreement that the Bank would never seek recourse against that security, we would have little doubt that Sec. 1823(e) would be violated. This transaction is functionally the same. The FDIC is entitled to at least as much protection here as it would be in those circumstances. There is an "asset" within the purview of Sec. 1823(e). See, e.g., OPS Shopping Center, Inc. v. FDIC, 992 F.2d 306, 309 (11th Cir.1993) (rejecting argument that letter of credit was a "liability of the bank rather than a specific asset of the bank which has been acquired by the FDIC").
 
 
 35
 The issuance without collateral and the concealments were, of course, accomplished by PNB and the Bank, not by Murphy. Murphy suggests that this fact distinguishes his situation from the situations where we have applied Sec. 1823(e). Those cases involved a two-party transaction, not a dispute between the issuer and the beneficiary of a letter of credit. See, e.g., Langley, supra; Zook Bros., 973 F.2d at 1449. It may well be argued, and convincingly, that the interests of a holder of a letter of credit should not be defeated by irregularities in a banking transaction, even when they involve statutory violations, where the irregularities do not materially affect the ability of the customer to obtain the credit. In other words the beneficiary of a letter of credit might well prevail against the FDIC where the irregularities or violations were technical and immaterial to the bank's ability to extend credit to its customers. Here, however, Murphy is not in a position to succeed on such a theory. These letters of credit transactions were structured in order to permit the PNB to obtain credit from a related institution more easily than permitted under the collateral requirements of federal law. Murphy was the intended beneficiary of that unlawful extension of credit. The first letter represented payment of an undoubtedly inflated purchase price of his stock in PNB, and the second, the 1985 letter of credit, represented security for his loans to PNB that avoided or at least delayed his being responsible on his guarantee of PNB's multimillion dollar debt. These particular letters of credit should not be the responsibility of the FDIC.
 
 
 36
 Contrary to the dissent's assertions, the problem is not an irregularity in the underlying stock purchase sale and loan transactions between PNB and Murphy. The problem lies in the credit extended by the bank to PNB, credit extended without the collateral required by federal banking law. This case does not implicate the traditional principle that a letter of credit is independent of the performance or non-performance of its underlying contract between the bank customers and beneficiaries. See U.C.C. Sec. 5-109; Anderson, Uniform Commercial Code Sec. 5-109-14 (issuer not responsible for any underlying contract or agreement between customer and beneficiary of letter of credit). The issue is not the bank's liability on the letter of credit, but the liability of the FDIC after the bank's failure. It is exactly that situation to which section 1823(e) is addressed.
 
 
 37
 Thus the district court's error, which the dissent seeks to perpetuate, was that the FDIC had to honor the letters of credit unless Murphy was guilty of fraud. Neither that issue, nor the cleanliness of Murphy's hands has any relevance to the FDIC liability. We fully accept the jury's verdict that Murphy was not a participant in Hilger's fraud and that Murphy's unfortunate investment was made in ignorant good faith. The applicability of section 1823(e) does not rest on such considerations. Nor does it matter whether the agreement sought to be enforced against the FDIC was oral or written. What matters is whether the agreement diminished the FDIC's interest in an asset acquired when it took over the bank, and whether the agreement was approved by the board of directors and properly recorded on the books and records of the bank.
 
 
 38
 These letters of credit, and the absence of legally required collateral to back them up, were not properly approved or carried on the bank's records. The letters of credit have a palpable adverse impact on the assets of the bank as required for invocation of Sec. 1823(e)'s protection. The letters of credit issued in violation of the collateral requirements of federal law created obligations that could only be satisfied by assets of the bank acquired by the FDIC. Had the law been followed and collateral supplied, the remaining assets of the bank would not have been threatened. Section 1823(e) was passed to ensure that the FDIC does not have to honor such obligations.
 
 
 39
 The JUDGMENT OF THE DISTRICT COURT IS REVERSED AND THE MATTER IS REMANDED WITH INSTRUCTIONS TO ENTER JUDGMENT IN FAVOR OF THE FDIC.
 
 WILLIAM A. NORRIS, Circuit Judge, dissenting:
 
 40
 The majority holds that the FDIC is not required to honor two letters of credit issued by the First National Bank, Chico, before the FDIC took it over. Although the majority rejects the FDIC's efforts to rely upon the D'Oench, Duhme doctrine, Sec. 1823(e), and Sec. 371c(c)(1) as justification for refusing to honor the letters of credit, it nonetheless rules in favor of the FDIC on the basis of a novel legal doctrine it forges from disparate elements of Sec. 1823(e) and Sec. 371c(c)(1). In applying the new law it makes to the facts of this case, the majority eviscerates the principle that the validity of a letter of credit is not affected by irregularities in the underlying transactions.
 
 
 41
 * The standby letters of credit in dispute were issued by the Bank to appellee Patrick J. Murphy to secure promissory notes issued to Murphy by the Bank's holding company. The holding company ultimately defaulted on the notes, and when Murphy attempted to draw upon his letters of credit, the Bank refused to honor them.[1] When the FDIC was appointed the Bank's receiver, it too refused to honor the letters of credit.
 
 
 42
 Murphy brought this action to enforce payment of his letters of credit. By way of defense, the FDIC argued to the jury that it was not obligated to honor the letters of credit for essentially three reasons. First, the FDIC argued that the letters of credit transactions were not negotiated at arms length and that Murphy, whom the FDIC contended was a director of both the Bank and the holding company at the time the first letter of credit was issued, engaged in improper self-dealing. Reporter's Transcript ("RT") at 1207-11. Second, the FDIC argued that as a sophisticated businessman and director or former director, Murphy knew or should have known that the letters of credit were issued in violation of federal banking laws that require, among other things, a bank affiliate to provide adequate collateral for letters of credit the bank issues for its benefit. RT at 1211-13. Third, the FDIC contended that Murphy had failed to make proper presentment of the letters of credit. RT 1214-18. The jury rejected these arguments and returned a verdict in favor of Murphy. The district court entered judgment for Murphy in the amount of the letters of credit plus interest.
 
 II
 
 43
 On appeal, the FDIC challenges neither the jury findings nor the jury instructions. Rather, it argues that, as a matter of law, it is not required to honor Murphy's two letters of credit, relying seriatim on D'Oench, Duhme, Sec. 1823(e), and Sec. 371c(c)(1). I agree with the majority that the FDIC's reliance upon these protective doctrines is misplaced. I discuss each of them in turn for the purpose of laying the groundwork for a critique of the far-reaching doctrine the majority has invented for the FDIC to use in defeating creditor's claims against failed banks.
 
 
 44
 Sec. 371c(c)(1). First the FDIC relies upon 12 U.S.C. Sec. 371c(c)(1), which prohibits a bank from extending credit to an affiliate without adequate collateral. Because in this case the Bank's holding company failed to provide collateral sufficient to protect the Bank against loss on the letters of credit, the FDIC argues that the Bank violated Sec. 371c(c)(1). And so it did. But the real question is why the Bank's own violation of Sec. 371c(c)(1) in failing to get adequate collateral from its holding company should have any bearing on Murphy's right to payment on the letters of credit.[2] The traditional principle that a letter of credit remains enforceable despite any irregularities in the underlying transaction has "prompted courts to uphold the financial device despite claims of underlying illegality." Security Finance Group, Inc. v. Northern Kentucky Bank and Trust Inc., 858 F.2d 304, 307 (6th Cir.1988). The FDIC offers no reason for disregarding that principle here.
 
 
 45
 D'Oench, Duhme. The FDIC's invocation of D'Oench, Duhme in this case is as much of a stretch as its reliance on Sec. 371c(c)(1). D'Oench, Duhme is an equitable, unclean hands estoppel rule that protects the FDIC against defenses or claims based upon secret or unrecorded side agreements which, if enforced, would diminish the value of particular assets as reflected in the books and records of a bank. It embodies a federal policy, derived from the statutory scheme that created the FDIC, to protect the FDIC "and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." FSLIC v. Gemini Management Co., 921 F.2d 241, 244 (9th Cir.1990) (quoting D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 457, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942)). As we have stated:
 
 
 46
 D'Oench, Duhme precludes obligors from asserting side deals or secret agreements which may mislead bank examiners against the FDIC to diminish the value of written loan obligations. Section 1823(e) bars the use of extrinsic agreements to diminish or defeat the FDIC's interest in an asset, unless the documents meet specific requirements. Together, the effect of D'Oench, Duhme and section 1823(e) is to allow federal and state bank examiners to rely exclusively on a bank's records in evaluating the worth of a bank's assets.
 
 
 47
 Notrica v. FDIC, 2 F.3d 961, 964-65 (9th Cir.1993) (emphasis added, internal quotations and citations omitted).
 
 
 48
 There are three obvious reasons why D'Oench, Duhme does not apply in this case. First, Murphy was not a party to any side agreement with the Bank, or with the Bank's holding company for that matter. Second, a standby letter of credit issued by the Bank is not a Bank asset, but a liability. Third, Murphy is an obligee, not an obligor. In the absence of a side agreement and an asset whose value would be diminished if a side agreement were enforced, the debtor-creditor relationship between the Bank and Murphy falls far outside the ambit of D'Oench, Duhme. See Agri Export Co-Op. v. Universal Sav. Ass'n, 767 F.Supp. 824, 832 (S.D.Tex.1991) (finding D'Oench, Duhme inapplicable to unrecorded letter of credit because of absence of secret agreement and fact that letter of credit is not a bank asset).
 
 
 49
 The central purpose of D'Oench, Duhme is clear: "The D'Oench, Duhme doctrine ... favors the interests of depositors and creditors of a failed bank, who cannot protect themselves from secret agreements, over the interests of borrowers, who can." Timberland Design, Inc. v. First Serv. Bank For Sav., 932 F.2d 46, 48 (1st Cir.1991) (quoting Bell & Murphy & Assoc. v. Interfirst Bank Gateway, N.A., 894 F.2d 750, 754 (5th Cir.), cert. denied, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990)) (emphasis added). D'Oench, Duhme was never intended to be used as a shield against a holder of a letter of credit. Murphy, after all, is suing as a creditor of the Bank, not as a borrower.
 
 
 50
 Sec. 1823(e). The FDIC fares no better with D'Oench, Duhme 's statutory cousin, Sec. 1823(e), even though the Bank failed to record the letters of credit on its own books as liabilities on a continuous basis. Section 1823(e) protects the FDIC from an "agreement which tends to diminish or defeat the interest of the [FDIC] in any asset " it acquires, if the agreement is not in writing, executed contemporaneously with the acquisition of the asset, approved by the bank's board of directors, and recorded on its books. It thus has two threshold requirements. First, the FDIC must have acquired a particular asset from a bank. See, e.g., Agri Export, 767 F.Supp. at 833 (requiring "particular, identifiable asset" as trigger for applicability of Sec. 1823(e)). Second, there must be an unrecorded and unapproved agreement that would lessen the FDIC's claim in that asset. See, e.g., Commerce Federal Sav. Bank v. FDIC, 872 F.2d 1240, 1244 (6th Cir.1989) (noting that Sec. 1823(e) applies only to "an action or defense which is anchored in an agreement separate and collateral from the instrument which the FDIC is seeking to protect"). For the same reasons that D'Oench, Duhme is inapplicable to this letter of credit case, Sec. 1823 is also inapplicable: there was no side agreement and the letters of credit were liabilities, not assets, of the Bank. See Notrica, 2 F.3d at 964-65. Indeed, what we said in Notrica is worth repeating: "Section 1823(e) bars the use of extrinsic agreements to diminish or defeat the FDIC's interest in an asset, unless the documents meet specific requirements." 2 F.3d at 964-5 (emphasis added).[3]
 
 III
 
 51
 Even though my colleagues agree with me that the FDIC cannot rely upon Sec. 371c(c)(1), D'Oench, Duhme, or Sec. 1823(e) as a defense to Murphy's action to enforce his letters of credit, they nonetheless rule in favor of the FDIC on the basis of a novel doctrine forged from disparate elements of Sec. 1823(e) and Sec. 371c(c)(1). They excuse the FDIC's failure to honor the letters of credit because (1) the Bank's own failure to carry the letters of credit on its books as liabilities constitutes an "irregularit[y] in the Bank's books," within the meaning of Sec. 1823(e), and (2) the failure of the Bank to obtain adequate collateral for the letters of credit from its holding company constitutes an "illegalit[y] in the banking transaction," within the meaning of Sec. 371c. Opinion at 13887. The majority's freshly-minted doctrine is as unsupported in logic as it is in law.
 
 
 52
 At the core of the majority's reasoning is an analogy it tries to draw between the letter of credit transactions at issue here and a hypothetical banking transaction to which Sec. 1823(e) would clearly apply. "If PNB [the holding company] had given collateral to the Bank as security for the issuance of the letters of credit and had made a secret agreement that the Bank would never foreclose upon that security," the majority writes, "we would have little doubt that Sec. 1823(e) would be violated." Opinion at 13887. It then declares, summarily, that "[t]his transaction is functionally the same. The FDIC is entitled to at least as much protection here as it would be in those circumstances." Id.
 
 
 53
 In fact, the real and the hypothetical transactions are neither analogous nor "functionally the same." The majority's hypothetical is nothing more than a paradigmatic Sec. 1823(e) or D'Oench, Duhme case: a bank's interest in an asset--the collateral posted by a holding company as security for the issuance of letters of credit--may not be diminished or defeated by an unrecorded side with a bank obligor, which, in the majority's hypothetical, is the holding company.
 
 
 54
 But what does a bank's failure to obtain adequate collateral from its holding company have to do with the bank's obligation to honor letters of credit issued to third parties? Absolutely nothing. The only issue the hypothetical raises is the FDIC's right to foreclose upon the collateral notwithstanding a secret agreement with the holding company not to foreclose. I am left bewildered as to how the majority's hypothetical sheds any light whatsoever on its holding that Murphy loses his rights under the letters of credit because of the Bank's failure to obtain adequate collateral from its holding company and the Bank's failure to record the letters of credit as liabilities on its own books.
 
 
 55
 In the real case before us, neither of Sec. 1823(e)'s two triggers have been tripped: the letters of credit were not assets of the Bank, and Murphy has not raised a claim or defense against the FDIC based upon a side agreement with the Bank. As a result, until words lose their meaning entirely, Murphy's two letters of credit simply cannot qualify as "agreement[s] which tend[ ] to diminish or defeat the interest of" the FDIC in an asset it acquired from the Bank. The holding company's failure to provide collateral, which is so important in the majority's analysis, is an extraneous fact that cannot substitute for Sec. 1823(e)'s express threshold requirements.[4]
 
 
 56
 The majority, in drawing upon its hypothetical secret transaction between the Bank and its holding company, conflates two related, but distinct transactions: the issuance of credit to the holding company and the issuance of letters of credit to Murphy. In doing so, the majority ignores settled law that the debtor-creditor relationship created between the Bank and Murphy must be viewed separately from the creditor-debtor relationship created between the Bank and its holding company. In a letter of credit transaction, the credit arrangement between the issuing bank and the beneficiary of the letter of credit "is distinct from and independent of all the related" contractual arrangements. J. Dolan, The Law of Letters of Credit: Commercial and Standby Sec. 2.09 at 2-31 (2d ed. 1984). See also FDIC v. Bank of San Francisco, 817 F.2d 1395, 1398 (9th Cir.1987) (noting that a letter of credit "becomes an engagement of the issuer to the beneficiary who accepts it"). Accordingly, the FDIC's obligation to honor Murphy's letters of credit exists "distinct from and independent of" whatever arrangement was made between the Bank and the holding company to give the Bank security for the issuance of the standby letters of credit.[5]
 
 
 57
 And that's not all. The majority's decision establishes as the law of the Ninth Circuit that the FDIC may repudiate--rather than enforce, as in the hypothetical and every past Sec. 1823(e) case of which I am aware--the facial terms of written contractual obligations, in this case letters of credit. See, e.g., Langley v. FDIC, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) (enforcing facial terms of note and personal guarantees, under section 1823(e), despite oral condition); FDIC v. Zook Bros. Const. Co., 973 F.2d 1448, 1451 (9th Cir.1992) (enforcing written guarantee held by FDIC despite defendant's claim that a side agreement released this obligation); FDIC v. Hatmaker, 756 F.2d 34, 37 (6th Cir.1985) (noting that "[t]he purpose [of Sec. 1823(e) ] is to protect the FDIC from hidden agreements that would defeat its interest in what is otherwise a facially valid note").
 
 IV
 
 58
 The majority is able to apply Sec. 1823(e) to Murphy's letters of credit only by rewriting the statute. At one point in its opinion, the majority states that "[w]hat matters [in determining whether Sec. 1823(e) applies] is whether the agreement diminished the FDIC's interest in an asset acquired when it took over the bank...." Opinion at 13888 (emphasis added). This is a precise and accurate reading of Sec. 1823(e), which requires an agreement that would diminish the FDIC's interest in a particular, identifiable asset. See Notrica v. FDIC, 2 F.3d at 964-65; Agri Export, 767 F.Supp. at 833; see also supra at 1494.
 
 
 59
 Just two sentences later, however, the majority radically amends the statute by asserting that honoring the letters of credit in the absence of adequate collateral would have a "palpable adverse impact on the assets of the bank as required for invocation of Sec. 1823(e)'s protection." Id. (emphasis added). The majority's unacknowledged change in the statutory language--its substitution of the plural word "assets," which Congress chose not to use, for the singular word "asset"--is as critical to its holding as it is unwarranted.
 
 
 60
 Paying Murphy would not defeat or diminish the FDIC's interest in any particular asset it acquired from the Bank. This is because, quite simply, a letter of credit is a liability, not an asset. To be sure, paying Murphy would diminish the Bank's total assets, specifically its cash account, since Murphy would presumably be paid in cash. But so would paying the electricity bill.
 
 
 61
 Indeed, under the majority's amended version of Sec. 1823(e), every obligation a bank owed to its creditors, without limit, would fall into Sec. 1823(e)'s domain, for every obligation it honors has a "palpable adverse impact" on the bank's assets generally. Cf. Thigpen v. Sparks, 983 F.2d 644, 649 (5th Cir.1993) (overly expansive reading of Sec. 1823(e) and related statute would transform the FDIC's protective doctrine, designed to safeguard "the failed bank's loan portfolio from D'Oench-like secret agreements[,] into a meat-axe for avoiding debts incurred in the ordinary course of business"). It has long been the law of the circuit, however, that the FDIC may not dishonor an obligation merely because doing so would diminish the capital of a bank it takes over: "[I]t could not have been the congressional intent, upon balance, to have the fiscal integrity of the deposit insurance fund (which can be adequately protected by other more equitable means) outweigh the policy of equitable and ratable payment of creditors...." First Empire Bank v. FDIC, 572 F.2d 1361, 1371 (9th Cir.1978), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).
 
 
 62
 Although the majority claims to reject the FDIC's "broadest contention" that every obligation must meet Sec. 1823(e)'s recordation and approval requirements, the breadth of its reading of Sec. 1823(e) belies such a limitation. Opinion at 13886. Only if "asset" means "total assets" does Sec. 1823(e) work to render Murphy's letters of credit unenforceable.
 
 
 63
 Not only is the majority's decision to apply Sec. 1823(e) to Murphy's letters of credit inconsistent with the statute's language, but it is contradicted by Sec. 1823(e)'s structure. If the threshold requirements of Sec. 1823(e) were as all-inclusive as the majority believes, Sec. 1823(e)(2) would make no sense. Section 1823(e)(1) requires that agreements falling within the parameters of the statute be reduced to writing. Section 1823(e)(2) requires such writings to be executed "contemporaneously with the acquisition of the asset by the depository institution." Here "asset" simply cannot mean a bank's assets generally. It can only refer to a specific item of value that the bank "acquires" at a particular time. As Judge Jones, writing for the Fifth Circuit, has observed, "These modifiers [the terms "asset and "acquisition" in subsection 1823(e)(2) ] bind Sec. 1823(e) to its origins in the D'Oench doctrine as a device to protect the federal regulators from side agreements that would have impeded the collection of obligations owed to the bank. Such obligations are the bank's 'assets' acquired in the course of its banking activities." Thigpen v. Sparks, 983 F.2d at 649 (emphasis added).
 
 
 64
 When a bank issues a letter of credit, it does not acquire an asset. It undertakes an obligation for the benefit of a third party. To be sure, the collateral it may receive from its customer constitutes an asset. But it is perverse to think that if the collateral is not provided, the letter of credit the bank issues--its liability--somehow becomes its asset. Yet this is exactly what the majority does in holding that the Bank's violation of Sec. 371c(c)(1) creates "an 'asset' within the purview of Sec. 1823(e)." Opinion at 1491.[6]
 
 
 65
 It is a serious error to try to fit this case under the rubric of Sec. 1823(e)--an error compounded by the fact that the commercial reliability of letters of credit is at issue. The majority's fabrication of a new doctrine out of bits and pieces of Sec. 1823(e) and Sec. 371c(c)(1) threatens settled commercial law governing letters of credit by creating an intolerable risk that they will not be honored if the issuing bank is taken over by government regulators. Cf. FDIC v. Bank of San Francisco, 817 F.2d at 1399 (noting that allowing defenses to actions for payment of letters of credit other than "fraud in the presentment of the required documents" would destabilize commercial transactions). Indeed, the majority's new rule of law "will undermine the certainty and reliability of commercial transactions which depend upon letters of credit." Chuidian v. Philippine National Bank, 976 F.2d 561, 567 (1992) (Fernandez, J., dissenting).[7]
 
 
 66
 The whole purpose of both D'Oench, Duhme and Sec. 1823(e) is to allow government regulators to assume the facial validity of loans and other assets in the Bank's portfolio. What my colleagues do, in forging elements of disparate statutes into a novel doctrine, is present government regulators with a new weapon that permits them to go behind letters of credit--which, on their face, memorialize bank obligations, not assets--in order to defeat the claims of bank creditors. The majority's holding represents an unprecedented and untenable extension of the doctrines that protect the deposit insurance fund. It converts Sec. 1823(e) into a "transactionally infinite[,] ... limitless, per se guarantee of victory by federal banking agencies...." Alexandria Association Ltd. v. Mitchell Co., 2 F.3d 598, 602 (5th Cir.1993) (holding to the contrary). I dissent.
 
 
 
 [1]
 (c) Collateral for certain transactions with affiliates
 (1) Each loan or extension of credit to, or guarantee, acceptance, or letter of credit issued on behalf of, an affiliate by a member bank or its subsidiary shall be secured at the time of the transaction by collateral having a market value equal to--
 (A) 100 per centum of the amount of such loan or extension of credit, guarantee, acceptance, or letter of credit, if the collateral is composed of--[certain obligations of the United States].
 * * *
 (B) 110 per centum of the amount of such loan or extension of credit, guarantee, acceptance, or letter of credit if the collateral is composed of obligations of any State or political subdivision of any State;
 (C) 120 per centum of the amount of such loan or extension of credit, guarantee, acceptance, or letter of credit if the collateral is composed of other debt instruments, including receivables; or
 (D) 130 per centum of the amount of such loan or extension of credit, guarantee, acceptance, or letter of credit if the collateral is composed of stock, leases, or other real or personal property.
 
 
 [2]
 The FDIC argues that Murphy failed to comply with the presentment requirements, because he did not comply with the facial terms of the agreements. See FDIC v. Bank of San Francisco, 817 F.2d 1395, 1398 (9th Cir.1987). It appears from the record that proper presentment was made, and the district court resolved the factual issues against the FDIC. We perceive no basis for reversal on this ground
 
 
 [1]
 The Bank originally refused to honor the letters of credit on the ground that they were not authentic, a theory that the FDIC does not pursue on appeal
 
 
 [2]
 Section 371c constitutes part of a regulatory scheme that requires banks to carry out their business according to a set of statutory guidelines. If a bank violates Sec. 371c by issuing credit to an affiliate without adequate collateral, it--not the parties to whom it issues letters of credit--may be subject to administrative sanctions. See, e.g., 12 U.S.C. Sec. 504 (subjecting banks that violate, inter alia, Sec. 371c to civil penalties). Sec. 371c regulates banks; it does not create defenses to bank obligations to third party creditors
 
 
 [3]
 Section 1823(e) was amended to its present form in 1989. Other circuits have held that before the 1989 amendment, Sec. 1823(e) did not apply to the FDIC in its capacity as receiver. See, e.g., Beighley v. FDIC, 868 F.2d 776, 783 (5th Cir.1989). The majority relies on the text of Sec. 1823(e) as amended in 1989, assuming without discussion that the amendment applies retroactively to the transactions at issue in this case, which took place in 1986
 
 
 [4]
 I discuss in greater detail the majority's attempt to categorize Murphy's letters of credit as "assets" in part IV, infra
 
 
 [5]
 Contrary to the majority's characterization of my position, I fully agree with the majority that no irregularity in the transaction between Murphy and the holding company is at issue in this case. See Opinion at 1492. Nor do I dispute the majority's conclusion that the Bank violated federal banking law by failing to obtain collateral from its holding company. I part company with the majority because I fail to understand how such internal irregularities can possibly justify a refusal to honor the letters of credit. That Murphy was an "intended beneficiary of an unlawful extension of credit," Opinion at 1491, is true, but irrelevant to whether the FDIC should be excused from honoring the letters of credit. All that is relevant is that the Bank engaged its own credit in issuing the letters of credit to Murphy
 
 
 [6]
 The majority cites OPS Shopping Center, Inc. v. FDIC, 992 F.2d 306, 309 (11th Cir.1993), to support its assertion that "[t]here is an 'asset' within the purview of Sec. 1823(e)." Opinion at 1491. But OPS, which the majority quotes out of context, lends it no support. OPS was decided under D'Oench, Duhme, not Sec. 1823(e), and the court specifically noted "[t]he FDIC does not contend in this case that there was an asset held by the FDIC to which the letter of credit was related." Id. at 309 n. 4. In fact, the parties to the instant case stipulated, as the majority notes, that the letters of credit at issue are bank liabilities, not assets: "[B]oth parties stipulated that '[t]he letters were not carried on the books of accounts, accounting records or ledgers of FNB as liabilities of the bank, contingent or otherwise, as of March of 1986.' " Opinion at 1487 (emphasis added)
 
 
 [7]
 Despite its disclaimer, the majority concludes that "[t]hese particular letters of credit should not be the responsibility of the FDIC," Opinion at 1492, partly on the basis of its sense that Murphy's hands are unclean. Without a word of elaboration, the majority accuses Murphy of receiving "an undoubtedly inflated purchase price" for his stock in the holding company and of delaying his responsibility to guarantee the holding company's debt. Id
 But this is pure speculation. How do we know that the price Murphy received for his stock was "inflated"? The majority doesn't tell us. And why does the fact that Murphy may have made money on his stock defeat his right to enforce the letters of credit? Again the majority doesn't tell us. Nor does it mention that, in response to an argument by Murphy's trial counsel that the price Murphy received for his holding company stock was reasonable, the FDIC's trial counsel called the entire issue of the stock's value a "red herring" that has "nothing to do with the transaction with the Bank." RT at 1208. Yet now, on appeal, the majority makes much of that very red herring.
 The majority also makes a finding of fact that the second letter of credit issued to Murphy is unenforceable because the loan Murphy made to the holding company was used to reduce indebtedness that Murphy guaranteed. What the majority seems to be saying is that the transactions were somehow tainted because Murphy was an insider who engaged in self-dealing. The trouble with this bit of appellate factfinding is that the jury exonerated Murphy of any wrongdoing as an insider. At trial the FDIC argued to the jury that the Bank was "an innocent intended victim in this case" (RT at 1206), that Murphy was an insider who engaged in self-dealing ("Well, if that's not self-dealing, I don't know what is." RT at 1209), that Murphy's dealings were not "arms-length" (RT at 1207), and that Murphy had failed to carry his burden that his dealings with the Bank were "just and reasonable" (RT at 1207, 1209). The jury found for Murphy on all these issues.
 What the majority has done by considering the equities of the transactions is exactly what the Supreme Court has said courts may not do: it has taken Sec. 1823(e)'s precise statutory requirements and "graft[ed] equitable exceptions" onto them. Langley v. FDIC, 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987).