**E.I. DU PONT DE NEMOURS AND COMPANY, Appellant,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Receiver for United National Bank of Washington, Appellee.**

**No. 92–5384.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 7, 1994.

Decided Aug. 26, 1994.

Raymond Michael Ripple argued the cause for appellant. With him on the briefs was David W. O'Brien. Dale A. Cooter and Cyrus J. Gardner entered an appearance.

J. Scott Watson, Sr. Atty., F.D.I.C., argued the cause for appellee. With him on the brief were Ann S. DuRoss, Asst. Gen. Counsel, and Richard J. Osterman, Jr., Sr. Counsel, F.D.I.C., Dennis S. Klein and Steven T. Corliss.

Before EDWARDS, BUCKLEY, and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge HARRY T. EDWARDS.

GINSBURG, Circuit Judge:

E.I. du Pont de Nemours and Co. sued the Federal Deposit Insurance Corporation, in its capacity as receiver of the United National Bank, for the bank's breach of its responsibilities under an escrow agreement. The district court granted summary judgment for the FDIC on the ground that, under the teaching of *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the FDIC may not be sued on an escrow agreement that by its terms has expired. Because we find *D'Oench* and its statutory counterparts inapplicable, we remand the case for further proceedings in the district court.

## I. Background

For the purpose of this appeal we accept as true the following facts alleged in du Pont's complaint. *See Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1273 (D.C.Cir.1994). In November 1982 Kimberly Industries Co. was awarded a contract to supply the District of Columbia with ferric chloride. On December 20, 1982 Kimberly contracted to buy from du Pont all of its requirements for "delivery to the District of Columbia of liquid ferric chloride during 1983," and du Pont agreed to make ferric chloride available to Kimberly for 1983 and thereafter under any extension or renewal of its contract with the District of Columbia.

Kimberly was not "obligated to continue to obtain ferric chloride from [du Pont] for any period beyond December 31, 1983," but Kimberly did agree to give du Pont the opportunity to match any better offer it received. The contract also provided that du Pont and Kimberly would enter into an escrow agreement with Kimberly's bank, the United National Bank of Washington, "to provide for automatic payment to [du Pont] of all amounts due to it" under the contract with Kimberly. The escrow agreement provided that Kimberly would arrange for the District of Columbia to pay into the escrow account all "amounts payable to [Kimberly] ... for delivery of liquid Ferric Chloride during 1983." UNB would pay du Pont's invoices "within ten (10) days of receipt of payment by the District of Columbia."

Throughout 1983 UNB made payments to du Pont in keeping with the terms of the escrow agreement. Kimberly's contract with the District of Columbia was renewed several times, and from all appearances so too was the escrow arrangement, for du Pont "generally received payments from UNB on time from 1983 through 1985." Unbeknownst to du Pont, however, from March 1985 to March 1988 the District sent checks directly to Kimberly rather than to UNB. Kimberly deposited at least some of those funds into the escrow account and UNB continued to receive and to make payments upon du Pont's invoices when Kimberly directed it to do so. In 1986, when du Pont's accounts receivable began to mount and Kimberly told du Pont that the District was late in making payments to the bank, UNB assured du Pont that the mechanics of the escrow agreement remained in effect. By March 1988, du Pont had invoiced UNB for more than $1 million worth of ferric chloride that Kimberly had not authorized the bank to pay.

Du Pont sued UNB in April 1989, alleging negligence, breach of the escrow agreement, and breach of fiduciary duty. In March 1991, the district court denied UNB's motion for summary judgment, in which the bank claimed that the escrow agreement had expired in 1983. The district court held that du Pont could try to prove that the parties had extended the escrow agreement by their con-

duct. In April of that year UNB merged with Madison National Bank, which was declared insolvent in May. The FDIC was then appointed receiver and substituted as the defendant in this case.

The FDIC moved anew for summary judgment, arguing that in a suit against the FDIC as receiver du Pont is barred by federal law from asserting liability under an agreement not reflected in the records of the bank in receivership. The district court granted that motion, noting that the substitution of the FDIC as receiver "fundamentally alter[ed] the posture of the case," because "the FDIC's legal rights are significantly different than those of the banks for whom it is a receiver." Whereas in a suit against UNB du Pont might be able to prove that the parties "perpetuated by conduct the escrow relationship," the court held that, under *D'Oench Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its statutory counterparts such a showing may not be made in a suit against the FDIC. Du Pont appeals.

## II. Analysis

■ The question presented by this appeal is whether du Pont is barred under the doctrine of *D'Oench*, or by 12 U.S.C. §§ 1823(e) or 1821(d)(9)(A), from asserting claims against the FDIC for UNB's negligence and breach of fiduciary duty arising out of the 1983 escrow agreement as allegedly extended by the parties' conduct. We review such a question of law *de novo*.

The FDIC's "basic mission is to protect insured depositors." *Villafane–Neriz v. FDIC*, 20 F.3d 35, 39 (1st Cir.1994). When an insured bank fails, the FDIC plays two roles under the National Bank Act, 12 U.S.C. § 21 *et seq*. In its corporate capacity, i.e. as insurer of deposits, the FDIC either pays depositors' claims in cash or "mak[es] available to each depositor a transferred deposit in another insured bank in an amount equal to the insured deposit." 12 U.S.C. § 1821(f). In its capacity as court-appointed receiver, the FDIC steps into the shoes of the failed bank and takes possession of its assets and liabilities. *Vernon v. FDIC*, 981 F.2d 1230, 1234 (11th Cir.1993). As receiver the FDIC

has a responsibility to marshal the assets of the bank and to distribute them to the bank's creditors and shareholders. *Branch v. FDIC*, 825 F.Supp. 384, 392 (D.Mass.1993). In performance of its duties, the FDIC may operate the institution, liquidate it, merge it with another insured bank, transfer some or all of its assets to another bank, create a new bank, or structure a transaction that combines two or more of those options. 12 U.S.C. § 1821(d). In the vast majority of cases, however, the FDIC arranges a "purchase and assumption" of the failed bank's assets and liabilities respectively.

> [T]he FDIC as receiver arranges to sell acceptable assets of the failed bank to an insured, financially sound bank, which assumes all of the corresponding deposit liabilities and reopens the failed bank without an interruption in operations or loss to depositors. The FDIC as receiver then sells to the FDIC in its corporate capacity the assets that the assuming bank declined to accept. The corporate entity of the FDIC in turn attempts to collect on the unacceptable assets to minimize the loss to the insurance fund.

*Grubb v. FDIC*, 868 F.2d 1151, 1155 (10th Cir.1989). A purchase and assumption "must be made with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." *Langley v. FDIC*, 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987) (internal quotation marks omitted).

Du Pont brings suit against the FDIC in its capacity as receiver. The FDIC claims immunity on the basis of a federal common law doctrine that originated with the *D'Oench* case. In that case a securities dealer had sold the Belleville Bank & Trust Company of Illinois bonds upon which the issuer subsequently defaulted. So that the bank could avoid carrying past due bonds on its books, the securities dealer executed unconditional notes in the face amount of the bonds and made certain interest payments upon them for the purpose of keeping them up "as live paper." *Id.* 315 U.S. at 454, 62 S.Ct. at 678. The receipt for the dealer's notes indicated that they would not be called

for payment and that all interest payments would be repaid. When the bank failed the FDIC stepped in as receiver and demanded payment of the notes. The securities dealer asserted lack of consideration, as well as the side agreement, but the Supreme Court held that "an accommodation maker is not allowed th[e] defense [of no consideration] as against the receiver of the bank ... where his act contravenes a general policy to protect the institution of banking from such secret agreements." *Id.* at 458, 62 S.Ct. at 680. The Court said that although the arrangement was not an outright violation of the National Bank Act, to allow the defense would nonetheless violate the policy behind the Act, *viz.* "to protect [the FDIC] from misrepresentations made to induce or influence [it,] including misstatements as to the genuineness or integrity of securities in the portfolios of banks which it insures or to which it makes loans." *Id.* at 459, 62 S.Ct. at 680. The Court explained:

> The test is whether the note was designed to deceive the creditors or the public authority or would tend to have that effect. It would be sufficient in this type of a case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.

*D'Oench* at 460, 62 S.Ct. at 681.

In 1950, as part of the Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq.*, the Congress supplemented and in part codified the *D'Oench* doctrine with a provision that bars anyone from asserting against the FDIC any agreement not properly recorded in the records of the bank that would diminish the value of an asset held by the FDIC. 12 U.S.C. § 1823(e). That provision currently reads as follows:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—
>
> (1) is in writing,

> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (4) has been continuously, from the time of its execution, an official record of the depository institution.

As originally enacted the first sentence of § 1823(e) did not include the "or as receiver" clause; some courts nonetheless interpreted § 1823(e) to cover claims brought against (i.e. rather than by) the FDIC, *see e.g. Beighley v. FDIC,* 868 F.2d 776, 783–84 (5th Cir. 1989). The Congress expressly dealt with such claims in 1989 as part of the Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183. It provided first that "any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the [FDIC]," 12 U.S.C. § 1821(d)(9)(A), and it added the "or as receiver" clause to the first sentence of § 1823(e).

██ Although §§ 1823(e) and 1821(d)(9)(A) substantially codify *D'Oench, see OPS Shopping Center, Inc. v. FDIC,* 992 F.2d 306, 309 n. 3 (11th Cir.1993); *Bowen v. FDIC,* 915 F.2d 1013, 1015 n. 3 (5th Cir. 1990); *Mainland Savings Ass'n v. Riverfront Assoc., Ltd.,* 872 F.2d 955, 956 (10th Cir.1989), cases that do not fit neatly into one of the statutory provisions the courts continue to decide under the federal common law following from *D'Oench.* Thus, one court describes *D'Oench*'s continuing role as that of "a safety net":

> § 1823(e) and § 1821(d)(9)(A) are Congress's attempts to codify, at least in part, the policy represented by *D'Oench,* but *D'Oench* remains to cover situations which fall through the cracks.

*In re NBW Commercial Paper Litigation,* 826 F.Supp. 1448, 1466 (D.D.C.1992). In

fact, the statute is both broader and narrower than the *D'Oench* doctrine itself. It is broader in that the statute makes the fault of the party asserting the unwritten agreement irrelevant, whereas the common law doctrine is based upon the concept of equitable estoppel, *Tuxedo Beach Club Corp. v. City Federal Savings Bank*, 749 F.Supp. 635, 642 (D.N.J.1990); non-fault may be asserted as a defense. *FDIC v. Meo*, 505 F.2d 790, 792–93 (9th Cir.1974). It is narrower, however, in that most courts have read the statute as applicable only to cases involving a specific asset, usually a loan, which in the ordinary course of business would be recorded and approved by the bank's loan committee or board of directors. *See, e.g., In re NBW Commercial Paper Litigation*, 826 F.Supp. at 1463–64. The common law doctrine, on the other hand, has been extended beyond traditional loan transactions. Taken together, however, there can be no doubt that *D'Oench* and its analogues "greatly limit the types of claims and defenses that borrowers may assert against the FDIC." *Villafane-Neriz*, 20 F.3d at 40.

A. §§ 1823(e) and 1821(d)(9)(A)

■ Du Pont argued in the district court, and reiterates on appeal, that the statutory provisions are no bar to its suit. The district court took note of du Pont's argument, but did not squarely decide the issue. The FDIC asserts that both the statute and the common law *D'Oench* doctrine bar du Pont's suit, but it frames no argument specifically in terms of either statutory provision. Instead, quoting *In re NBW Commercial Paper Litigation*, 826 F.Supp. at 1457, it says rather unhelpfully that "*D'Oench* and the statute have 'cross-pollinated such that it is very difficult to decide where the statute ends and *D'Oench* begins.'" We think it clear, however, that the statutory provisions do not apply to this case. Du Pont does not rely upon the escrow agreement in order to diminish the FDIC's interest in "any asset," as contemplated by § 1823(e). The bank, of course, never had an interest in the money in escrow, nor does du Pont allege that the bank converted that money to its own use. Indeed, as the district court pointed out *In re NBW Commercial Paper Litigation*, 826

F.Supp. at 1463, the requirements of § 1823(e) effectively limit that provision to conventional loan transactions:

> [S]ubsection (3) specifically refers to the loan committee and the other subsections describe a process that might be followed in the course of making a loan. The writing requirements, which are stringent, will almost never be satisfied by investors ... creditors, or tort claimants. There is no hint in any of Congress' pronouncements that such individuals should be disfavored.

Section 1821(d)(9)(A) incorporates by reference the requirements of § 1823(e). Therefore it does not apply either to the escrow agreement at issue in this case. We turn therefore to the centerpiece of the parties' arguments, the federal common law.

B. The *D'Oench* Doctrine

■ Du Pont argues that the common law *D'Oench* doctrine does not bar its suit against the FDIC because du Pont "is not an obligee trying to avoid a commitment to a financial institution or the FDIC"; rather, the "transaction involves *deposit* of *funds with* the bank and a concurrent obligation of the bank to properly account the funds and make disbursements to Du Pont." (Emphases in du Pont brief). Du Pont is, of course, correct that this is not the paradigmatic *D'Oench* doctrine case of an obligee seeking to avoid a financial commitment to a failed bank. *See Vernon v. RTC*, 907 F.2d 1101, 1107 (11th Cir.1990); *FDIC v. Aetna Casualty & Surety Co.*, 947 F.2d 196, 207 (6th Cir.1991). That is not the end of the matter, however. For, as the FDIC correctly points out, the doctrine has been applied in other situations as well. And rightly it should be, we think, when the purposes served by the doctrine arise in those situations. As one court has stated:

> The focal point is not the type of transaction, but whether it contradicts what the bank has stated to the FDIC or is part of any effort to mislead the FDIC as to the financial status of any banking institution.

*Castleglen, Inc. v. RTC*, 984 F.2d 1571, 1581 (10th Cir.1993).

■ According to the Supreme Court (which was actually interpreting § 1823(e) in the light of *D'Oench*, the "leading case in this area prior to enactment" of the statute) the doctrine serves three purposes:

1. "One purpose ... is to allow [the FDIC] to rely on a bank's records in evaluating the worth of the bank's assets" when it is "deciding whether to liquidate a failed bank ... or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank...." Such an evaluation, as we have seen, must be made "with great speed, usually overnight."

2. "A second purpose" is to "ensure mature consideration of unusual loan transactions by senior bank officials."

3. The third is to "prevent fraudulent insertion of new terms, with the collusion of the bank employees, when a bank appears headed for failure."

*Langley*, 484 U.S. at 91–92, 95, 108 S.Ct. at 401; *see also OPS Shopping Center*, 992 F.2d at 311.

The FDIC maintains more broadly that "[t]he *D'Oench* doctrine must necessarily provide prophylactic protection against all manner of unsound or illegitimate banking practices that threaten the solvency of financial institutions insured by the FDIC." That position has some support in the broadest of statements made by some other circuits, *see, e.g., Bowen v. FDIC*, 915 F.2d 1013, 1015–16 (5th Cir.1990) ("Simply put, transactions not reflected on the bank's books do not appear on the judicial radar screen either"), but no court has been willing to grant the FDIC the near-absolute immunity from suit that it seeks here. *See, e.g., Vernon*, 907 F.2d at 1107 (declining RTC's request to extend *D'Oench* so as to shield "all assets, whether actually possessed or receivable, acquired by a federal insurer or its successor in interest from all claims tending to diminish those assets, save those claims clearly supported by the records of the insolvent bank").

■ Despite the FDIC's suggestion to the contrary, we think the *D'Oench* doctrine must have some boundaries. As our colleagues in the Fifth Circuit recently put it, "[*D'Oench* ] is not a limitless, per se guarantee of victory by federal banking agencies

and their successors in interest." *Alexandria Associates, Ltd. v. Mitchell Co.*, 2 F.3d 598, 602 (1993). The wisdom of that observation is brought home when one bears in mind what is at stake here, namely the negation of potentially valid state law claims arising at the border between contract and tort.

By far the majority of *D'Oench* doctrine cases involve attempts to resist collection on notes the FDIC has acquired from the failed bank. In that paradigmatic *D'Oench* situation, the courts have in effect deemed the FDIC a quasi-holder-in-due-course, with a complete defense against claims of common law fraud and violation of state or federal securities laws, and with immunity to the affirmative defenses of waiver, estoppel, unjust enrichment, failure of consideration, and usury. *See Vernon*, 907 F.2d at 1106.

A substantial body of case law, however, extends *D'Oench* beyond the paradigm in which a debtor seeks to assert a defense to liability on a note held by the FDIC. Courts have applied *D'Oench* to bar a suit to collect upon a letter of credit issued in violation of an FDIC cease and desist order and not approved by the proper officers or recorded in the bank's files, *OPS Shopping Center, Inc. v. FDIC*, 992 F.2d at 311; to bar any defense to collection on a note, as well as affirmative claims of lender liability, based upon breach of an oral promise to make a loan, *Timberland Design, Inc. v. First Service Bank for Savings*, 932 F.2d 46, 50–51 (1st Cir.1991); and to bar suit for specific performance of an oral loan repurchase agreement, where the loan on its face, as well as a report filed with the FDIC, indicated that it was without recourse. *First State Bank v. City and County Bank*, 872 F.2d 707, 718 (6th Cir.1989). Where the failed bank was the beneficiary on a letter of credit, some courts have also barred the defenses of non-transferability and fraud. *FDIC v. Bank of Boulder*, 911 F.2d 1466, 1475 (10th Cir.1990); *FDIC v. Bank of San Francisco*, 817 F.2d 1395, 1399–1400 (9th Cir.1987).

As we have said, however, the *D'Oench* doctrine does have its limits. One court has declined the FDIC's invitation to extend *D'Oench* to bar a suit sounding in fraud, to

wit the bank's failure to disclose its true financial condition before a stock offering. *See Vernon,* 981 F.2d at 1234. In that case, the court held that *D'Oench* does not "operate[ ] to bar free standing tort claims that are not related to a specific asset acquired by the FDIC." *Id.* at 1233–34. Another court has held that the receiver cannot avoid suit for wrongful dishonor of a letter of credit executed by the bank's president where the letter of credit was not "intended to deceive, nor likely to deceive, banking authorities." *Agri Export Co-op. v. Universal Savings Ass'n,* 767 F.Supp. 824, 832 (S.D.Tex.1991). That court questioned whether "*D'Oench* applies when the agreement that the insuring institution is trying to nullify is what might be characterized as a pure obligation of the failed bank." *Id.; see also Murphy v. FDIC,* 12 F.3d 1485, 1494 (9th Cir.1993) (Norris, J., dissenting) (reh'g *en banc* granted, 22 F.3d 903 (1994)) ("*D'Oench, Duhme* was never intended to be used as a shield against a holder of a letter of credit. [The plaintiff], after all, is suing as a creditor of the Bank, not as a borrower"). Yet another court allowed suit for the failed bank's alleged breach of the duty of care undertaken in a participation agreement; "[t]hat proof of the breach of the agreement may require resort to evidence not contained in [the bank's] files does not bring the rule of estoppel into play." *Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091, 1098 (N.D.Tex.1990); *accord Howell v. Continental Credit Corp.,* 655 F.2d 743, 746 (7th Cir.1981) (*D'Oench* held inapplicable where "the document the FDIC seeks to enforce is one ... which facially manifests bilateral obligations and serves as the basis of the lessee's defense"). The Fifth Circuit has declined to extend *D'Oench* to a non-banking transaction, such as the sale of partnership interests in real estate by officers of a subsidiary of a failed bank. *Alexandria Associates,* 2 F.3d at 603. The Ninth Circuit has developed a "completely innocent party" exception to *D'Oench,* in a case where "a bank borrower who was neither a party to any deceptive scheme involving, nor negligent with respect to, circumstances giving rise to the claimed defense to his note." *FDIC v. Meo,* 505 F.2d 790, 792–93 (9th Cir.1974).

No court has yet considered whether *D'Oench* should bar a suit against the FDIC as receiver for negligence or breach of fiduciary duty arising out of an escrow agreement. Because the escrow agreement in this case can be seen from its face to have expired, and was extended if at all only by the conduct of the parties thereto, the FDIC argues that du Pont "lent itself to an arrangement that would tend to mislead bank examiners.... [and therefore] falls squarely within the traditional scope of *D'Oench.*" True, a bank examiner might have thought that the agreement had expired by its terms, but the inquiry cannot stop there. We return to the three purposes of the *D'Oench* doctrine. Only the first of those purposes— enabling the FDIC to rely upon the records of the bank in deciding whether to liquidate it—is even arguably relevant to the instant case.

In fact, however, the FDIC could not glean from examining even an on-going written escrow agreement any information that could affect its decision whether to liquidate the bank or to initiate a purchase and assumption transaction. That decision must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." *Langley,* 484 U.S. at 91, 108 S.Ct. at 401. Even if the escrow agreement clearly extended until 1987, as du Pont alleges it did by virtue of the parties' conduct, a bank examiner conducting a quick overnight examination of the bank's net worth could not conceivably learn that bank officials had not abided by the terms of the agreement from some time in 1985 until the account was closed in 1987, thereby exposing the bank to liability in both contract and tort. *See FDIC v. Aetna Cas. & Sur. Co.,* 947 F.2d 196, 202 (6th Cir.1991) (an insurance policy is "not the type of asset that lends itself easily to an 'overnight' or instantaneous assessment"). As in a suit for employment discrimination or for damages in a slip and fall case, the information relevant to proof of liability in this type of case will not be readily available to a bank examiner. As the Eleventh Circuit stated in *OPS Shopping Center,* 992 F.2d at 310,

Banking examiners who inspect and evaluate the bank records reasonably expect the records of regular banking transactions to reflect *all* of the rights and liabilities of the bank regarding such regular banking transactions.... If the free-standing tort claim had related to the discriminatory treatment of an employee, the relevant records would reside in the personnel department of the bank. In the case of an automobile accident in the scope of an employee's employment, there would be no record at all, at least until the investigatory process took shape.

So, too, here. That the escrow agreement might have appeared to have expired could not possibly have caused the FDIC to act any differently in this case.

Our analysis is in accord also with the Eleventh Circuit's test, recently reaffirmed in *FDIC v. Govaert (In re Geri Zahn, Inc.),* 25 F.3d 1539 (11th Cir.1994). Under that court's approach, *D'Oench* is a bar only to those tort claims that are "sufficiently intertwined with regular banking transactions, such that exclusion of the alleged 'secret agreement' accords with the underlying policies of *D'Oench.*" *Id.* at 1543 (citing *OPS Shopping Center,* 992 F.2d at 310). The key question is whether "the oral representations"—or in this case the actions that allegedly renewed the escrow agreement—were "matters that would generally be reflected in the records of ordinary banking transactions. This reflects the central purpose of *D'Oench.*" *Id.* at 1543. Du Pont's claims for breach of the escrow agreement and breach of fiduciary duty pass this functional test.

To allow the FDIC to avoid liability for UNB's alleged breach of fiduciary duty would serve no purpose reflected in the FDIA. "To be sure, paying [du Pont] would diminish the Bank's total assets, specifically its cash account, since [du Pont] would presumably be paid in cash. But so would paying the electricity bill." *Murphy,* 12 F.3d at 1496 (Norris, J., dissenting). As the Fifth Circuit so graphically put the matter, *D'Oench* should not be converted into a "meat-axe for avoiding debts incurred in the ordinary course of business." *Thigpen v. Sparks,* 983 F.2d 644, 649 (5th Cir.1993). We

therefore decline to extend it to the facts of this case.

### III. Conclusion

The principle of equitable estoppel set forth in *D'Oench* and codified in §§ 1823(e) and 1821(d)(9)(A) does not apply in this case. Even if the records of the bank fully reflected the allegedly continuing existence and validity of the escrow agreement with du Pont, that information would not have apprised the FDIC of the bank's potential liability for breach of its fiduciary duty, and thus would not have had any bearing upon the FDIC's decision whether to liquidate the failed bank or to arrange a purchase and assumption transaction. The judgment of the district court is therefore

*Reversed.*

HARRY T. EDWARDS, Circuit Judge, dissenting:

Were we writing on a clean slate, we might be free to decide this case on the basis of the "policy" considerations that obviously have influenced the majority. We are not so unconstrained, however. I recognize that this circuit has not had occasion to address the common law doctrine embodied in *D'Oench, Duhme & Co., Inc. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its statutory cousin, 12 U.S.C. sec. 1823(e), which controls the judgment in this case. But the Supreme Court and our sister circuits have had numerous occasions to consider and apply the doctrine. As I read their decisions, I see no principled way to distinguish this case from the myriad of factually similar cases in which the *D'Oench* doctrine has been routinely enforced to bar the presentation of claims of the sort at issue here.

The law is clear that, under *D'Oench,* no agreement may be asserted against the FDIC—either as an affirmative claim or as a defense—unless the principal terms of the agreement are manifest from the bank's written records. *See Timberland Design, Inc. v. First Serv. Bank for Sav.,* 932 F.2d 46, 48–49 (1st Cir.1991). There are two important purposes underlying this doctrine: (1) federal examiners must be able rapidly and accurately to determine the health of a

failed institution based solely on the formally maintained records of that institution, *Langley v. FDIC,* 484 U.S. 86, 91–92, 108 S.Ct. 396, 401–402, 98 L.Ed.2d 340 (1987); and (2) as between bank customers and the American taxpayers, the risk of nonrecovery from a failed institution should be placed on customers who have failed to protect themselves by committing their agreements with the bank to writing, *id.* at 94, 108 S.Ct. at 402; *see also In re NBW Commercial Paper Litig.,* 826 F.Supp. 1448, 1461 (D.D.C.1992) ("*D'Oench* ... insure[s] that creditors and depositors ... are favored over those who can protect themselves against harm."). The *D'Oench* bar is "expansive and perhaps startling in its severity," *Bowen v. FDIC,* 915 F.2d 1013, 1015 (5th Cir.1990), but it has been seen to be fully justified by a well-established national policy that protects federal insurers (and the taxpayers they represent) against challenges based on unrecorded agreements.

Du Pont does not ground its substantive claims on a current written agreement that resided in the bank's records at the time the bank failed. The written escrow agreement that originally set out the parties' obligations, by its own terms, expired at the end of 1983. Thus, du Pont's claim that the bank violated the terms of the escrow agreement in years beyond 1983 is dependent on evidence that the escrow agreement was extended. Yet, du Pont has not produced a written extension agreement, nor any other document that clearly evidences that the escrow agreement covered the period relevant to its complaint.

Du Pont instead relies on an alleged oral agreement with the bank to treat the escrow agreement as coterminous with the underlying contract between Kimberly and the District of Columbia, and on the parties' "course of conduct," which du Pont asserts evidences the ongoing nature of the agreement. In a simple contract action under state law, both types of evidence might demonstrate that parties intended to be bound by the terms of the escrow agreement beyond 1983, despite the written agreement's limited duration. But the context here is quite different: this case involves a bank failure requiring the federal government to take over the institution and find a successor bank to assume the failed bank's assets and liabilities. In such a circumstance, du Pont's putative agreement to extend the terms of the written escrow agreement cannot serve as a basis for holding the Government liable, because it is *unrecorded* and plainly barred by *D'Oench. See Twin Constr., Inc. v. Boca Raton, Inc.,* 925 F.2d 378, 384 (11th Cir.1991) (rejecting the use of parol evidence to validate an otherwise flawed agreement, the court stated that "[w]hile such an inquiry may be permissible in the context of normal contract construction, we do not believe that *D'Oench* and section 1823(e) permit this inquiry.").

The fact that this case involves an "escrow agreement," rather than a more typical debt instrument, does not change the result under *D'Oench. See OPS Shopping Ctr., Inc. v. FDIC,* 992 F.2d 306, 308 (11th Cir.1993) (noting that *D'Oench* "now applies in virtually all cases where a federal depository institution regulatory agency is confronted with an agreement not documented in the institution's records."). In its brief, du Pont asserts that in order for *D'Oench* and its attendant bar to apply, the legal challenge arising from the asserted agreement must diminish an asset of the bank, and that an escrow agreement is not an asset. However, every court that has considered the question has held that the existence of a specific asset is not a prerequisite to applying the *D'Oench* bar. *See id.* at 309–10 (providing citations). Further, absolutely nothing in the record supports du Pont's claim that an escrow agreement is such that it would be unimportant to a bank examiner evaluating the relative health of a failed institution. Indeed, at oral argument, the FDIC argued it does evaluate escrow agreements and that such agreements can be important to its examination, a contention du Pont did not even attempt to rebut. In light of the record, I do not see how we can second-guess the FDIC on this point.

Additionally, it is quite easy to imagine how an escrow agreement might represent an asset or a liability for a bank: such an agreement might permit the bank to take advantage of a "float" of funds; it might provide significant fees to the bank for servicing the agreement; and it might be trans-

ferable. At oral argument, in response to these very hypotheticals, du Pont's counsel conceded that an escrow agreement might be a thing of value to a bank, and subsequently to bank examiners who are pressed to make a quick assessment of the bank's financial soundness. We should be mindful that an escrow agreement is a negotiated contract, and there are an infinite number of ways, limited only by the parties' ingenuity, that an escrow agreement and the bank's escrow service might be drawn so as to be an important aspect of the bank's portfolio. For these reasons, I do not see how this court can "exempt" escrow agreements from *D'Oench*'s reach. The majority has simply rewritten the law, with neither authority nor good basis.

In this case, an application of *D'Oench* does not "punish" du Pont; rather, the law merely requires du Pont to bear the consequences of failing to commit to writing an alleged understanding that the escrow agreement extended beyond its terms. Du Pont failed to avail itself of numerous opportunities to protect its interests; the American taxpayer should not have to pay for du Pont's poor dealings. In short, both the law and the equities in this case favor the FDIC. Du Pont's attempt to assert claims premised on the extension of a written agreement beyond its terms—evidence of such extension being unrecorded—is the paradigmatic situation to which *D'Oench* applies. Accordingly, I dissent.