**In re INDEPENDENT BANKGROUP, INC., Debtor.**

**INDEPENDENT BANKGROUP, INC., Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver of First National Bank of Vermont d/b/a First National Bank of Vermont and the Internal Revenue Service, Defendants.**

Bankruptcy No. 94–10409–FGC.
Adversary No. 95–1080.

United States Bankruptcy Court.
D. Vermont.

Feb. 20, 1998.

F.M. Cadigan, P.D. Maggioni, Jr., Federal Deposit Insurance Corp. (FDIC) Legal Division, for F.D.I.C.

J.T. Schwidde, Glinka & Schwidde, Rutland, VT, Ronald H. Sinzheimer, Albany, NY, for Independent BankGroup (IBG).

## MEMORANDUM OF DECISION GRANTING FDIC AND DENYING DEBTOR SUMMARY JUDGMENT

FRANCIS G. CONRAD, Bankruptcy Judge.

The parties' Cross Motions for Summary Judgment require us to decide [1] whether a $4 million tax refund belongs to IBG or to FDIC. We hold, for the reasons that follow, that it belongs to FDIC.

### FACTUAL AND PROCEDURAL BACKGROUND

IBG was a Vermont Corporation engaged in the business of operating a bank holding company through which its subsidiary, First National Bank of Vermont (FNB), provided banking and financial services. FNB was a consolidated bank consisting of two other subsidiary banks, Caledonia National Bank of Danville and Bradford National Bank. In May 1991, the Board of Governors of the Federal Reserve System issued a Cease and Desist Order to IBG due to what it termed unsafe or unsound banking practices. In January 1993, FDIC took over as receiver of FNB.

IBG filed a petition for reorganization under Chapter 11 of the Bankruptcy Code on July 12, 1994. We confirmed its First Amended Plan of Reorganization (Plan) on May 31, 1995. The Plan, in part, proposed a distribution to IBG's creditors of any taxes refunded to IBG after the IRS set off any taxes due.

IBG filed a consolidated tax return for 1992 that showed a loss of about $10 million. FDIC also filed a 1992 return for FNB, showing a loss of about $11 million. Both IBG and FDIC (as receiver of FNB) independently used the carry-back provisions of the Internal Revenue Code to file amended

---

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b), and the General Reference to the Court under Part V of the Local District Court Rules for the District of Vermont. This is a core matter under 28 U.S.C. § 157(b)(2)(A), (E), and (O). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable to this proceeding by Fed. R.Bkrtcy.P. 7052.

returns for more profitable years (1982 through 1990) and calculated a refund for 1992 of approximately $4 million. IBG expected to use this projected refund as part of its Plan funding.

IBG claims that the refund is property of the bankruptcy estate. It asserts that there was a tax sharing agreement in place prior to FDIC receivership whereby IBG, as parent, customarily filed consolidated returns each year and arbitrarily allocated any liability or refund among its subsidiaries in its sole discretion. IBG's claim is that FDIC does not succeed to the refund as an asset because the refund never was an asset of FNB but rather was an asset of IBG, to be distributed by IBG in its sole discretion. FDIC, on the other hand, claims the refund belongs to the subsidiary bank, FNB, because it was generated by the two FNB banks on a stand alone basis. Because FNB is now in receivership, the refund belongs to FDIC as receiver and is not property of the estate.

In August 1984, the Federal Reserve Bank of Boston (FRBB) conducted an inspection of IBG and issued a Report of Holding Company Inspection suggesting that a tax sharing agreement "should be effected specifying intercorporate tax settlement policies . . . which conforms to the Board's policy statement."[2] The Board's policy statement dictates that the bank is to receive equitable treatment regarding tax sharing, including allocating appropriate refunds to the bank guided by what would occur if the bank filed an income tax return on a stand-alone basis.[3] A follow up inspection by the FRBB in 1987 states that "[t]he board of directors (of IBG) approved a conforming intercorporate tax sharing agreement at the December 14, 1984 meeting to be effective for the 1984 taxable year."[4] Nothing in the follow-up Report indicates that the agreement was in writing, but FRBB does deem the agreement "conforming." IBG asserts that its past practices of allocating refunds should sufficiently evidence the existence of the agreement. It is undisputed that no written agreement can be located by either party.

IBG brought this adversary proceeding against FDIC, claiming that the tax refund is property of the bankruptcy estate under 11 U.S.C. § 541, and that FDIC's attempt to collect the refund violates the automatic stay. 11 U.S.C. § 362.[5] Trial was set, and counsel for FDIC submitted a Trial Memorandum that we treated as a Motion for Summary Judgment. IBG cross moved for Summary Judgment. The resolution of this matter requires us to decide whether the existence of a tax-sharing agreement is relevant to FDIC's claim as receiver to any tax refund due FNB.

### SUMMARY JUDGMENT

To prevail on a motion for summary judgment, the movant must satisfy the criteria set forth in Fed.R.Civ.P. 56 as made applicable by Fed.R.Bkrtcy.P. 7056. Fed.R.Civ.P. 56 provides in part:

[T]he judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*See, Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Eastman Machine Co., Inc. v. U.S.*, 841 F.2d 469 (2d Cir.1988); *Hossman v. Spradlin*, 812 F.2d 1019, 1020 (7th Cir.1987); *Clark v. Union Mutual Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir.1982); *U.S. Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir. 1975).

---

**2.** Plaintiff's Trial Exhibit 4, FRBB Report of Bank Holding Company Inspection, dated August 6, 1984, pp. 1.

**3.** Plaintiff's Trial Exhibit 8, Defendant's Trial Exhibit 45, Policy Statement Regarding Intercorporate Income Tax Accounting Transactions of Bank Holding Companies and State–Chartered Banks That Are members of the Federal Reserve system, effective 9/25/78, pp. 2.

**4.** Plaintiff's Trial Exhibit 5, FRBB Report of Bank Holding Company Inspection, dated June 19, 1987, pp. 1–(1). Parenthetical added for clarity.

**5.** IBG's complaint also seeks a determination of the validity and extent of the IRS's claim and/or IBG's right to a refund. Those issues are not addressed here.

The primary purpose for granting a summary judgment motion is to avoid unnecessary trials where no genuine issue of material fact is in dispute. *Farries v. Stanadyne/Chicago Div.*, 832 F.2d 374, 378 (7th Cir.1987). If the presentation by the nonmoving party in support of its version of the facts is such that the Court could not properly direct a verdict against it in a jury trial, or enter a judgment in favor of the moving party notwithstanding a verdict favorable to the nonmoving party, the motion for summary judgment may not properly be granted. *Eastman, supra* 841 F.2d at 473, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

In *Anderson, supra*, the Supreme Court directed that in determining a motion for summary judgment under Rule 56:

> the judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—whether there is (evidence) upon which a jury can proceed to find a verdict for the party producing it....

*Id.,* (citations omitted).

Thus, the function of a Bankruptcy Court when considering a motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be resolved. *Id.,* 477 U.S. at 246–51, 106 S.Ct. at 2509–11; *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir. 1986), *cert. den.*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The party moving for summary judgment has the burden of clearly establishing that no relevant facts are in dispute. *Celotex, supra*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson, supra*, 477 U.S. at 252, 106 S.Ct. at 2512; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Eastman, supra*, 841 F.2d at 473. Speculation and conjecture will not suffice.

Once a party has met its initial burden, the opposing party must set forth specific facts showing that there is a genuine issue for trial and that the disputed fact is material. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983), *cert. den.*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Thus, if the movant carries its initial burden, the opposing party may not defeat the motion merely by relying on the contentions of its pleadings, but must produce significant probative evidence to support its position. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *U.S. v. Pent–R–Books, Inc.*, 538 F.2d 519, 529 (2d Cir.1976), *cert. den.*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977). Finally, in determining whether there is a genuine issue of material fact, we must view the evidence in the light most favorable to the party opposing the motion. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Eastman, supra*, 841 F.2d at 473; *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir.1985). Moreover, all inferences must be construed in favor of the nonmovant. *Diebold, supra*, 369 U.S. at 655, 82 S.Ct. at 994; *Eastman, supra*, at 473; *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir.1984).

Rule 56 also imposes the dual burden on the movant to establish the absence of disputed material facts and that summary judgment is warranted as a matter of law. *Boazman v. Economics Laboratory, Inc.*, 537 F.2d 210 (5th Cir.1976). It is inappropriate to grant summary judgment merely because a movant appears likely to prevail at trial; summary judgment may be granted only when the movant is entitled to relief beyond all doubt. *Federal Savings and Loan Ins. Corp. v. Williams*, 599 F.Supp. 1184 (D.Md. 1984).

The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson, supra*,

477 U.S. at 250, 106 S.Ct. at 2511; 9 *Charles Wright & Arthur R. Miller, Federal Practice and Procedure*, § 2524, at 541–42 (1971).

The record in a summary judgment proceeding includes more than a complaint and an answer. The Court must go beyond the mere pleadings of the parties and consider all of the admissible evidence set forth in the papers and all inferences reasonably drawn from such evidence to determine whether there is a genuine issue for trial. *Matter of Esposito*, 44 B.R. 817 (Bkrtcy.S.D.N.Y.1984). When an affidavit is submitted in connection with a motion for summary judgment, Rule 56(e) requires the affiant to set forth facts based on personal knowledge, rather than mere opinions or legal conclusions. An affidavit which is essentially conclusory and lacking in specific facts is inadequate to support the movant's burden. *Maldonado v. Ramirez*, 757 F.2d 48 (3rd Cir.1985). The moving party on a summary judgment motion meets its burden by affirmatively demonstrating from the record before the Court that there is no evidence to support an essential element of the nonmoving party's case. *Matter of Warner*, 65 B.R. 512 (Bkrtcy. S.D.Ohio 1986).

The requirements for summary judgment are satisfied in this case because no material facts are in issue, and FDIC is entitled to judgment as a matter of law.

## 12 U.S.C. § 1823(e) AND THE D'OENCH DUHME DOCTRINE

The crucial question is whether either 12 U.S.C. § 1823(e) or its common law counterpart, the *D'Oench Duhme* doctrine, defeats IBG's claim to the tax refund at the center of this dispute. We hold that if a written agreement exists which shows that the refund was the property of IBG prior to January 1993, then the statute does not apply and the refund properly belongs to IBG. In other words, if the refund was never an asset of FNB, as proven by a written agreement with certain, ascertainable terms, FDIC cannot claim an ownership interest. Alternatively, and most relevant, if there was merely an oral tax-sharing agreement, the *D'Oench Duhme* doctrine will prevent its assertion. Not only does this doctrine prevent IBG's

claim against the interest of FDIC, but common sense dictates that since the essential terms of that agreement can not be ascertained, IBG's contention must fail.

The Supreme Court, in *D'Oench, Duhme and Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), originally gave us the federal common law doctrine that protects FDIC against enforcement of unrecorded oral agreements that are not contained in the bank's records. The *D'Oench Duhme* doctrine "prevents plaintiffs from asserting as either a claim or defense against the FDIC oral agreements or 'arrangements'." *FDIC v. LeBlanc*, 85 F.3d 815, 821 (1st Cir.1996). *See also Adams v. Zimmerman*, 73 F.3d 1164, 1168 (1st Cir.1996); *Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 48–50 (1st Cir.1991). The relevant inquiry under *D'Oench* is whether the party seeking to use an agreement as a claim against FDIC "lent himself to a scheme or arrangement that would be likely to mislead or deceive banking authorities." *D'Oench, supra*, 315 U.S. at 460, 62 S.Ct. at 681. "[A] party can be said to have lent themself to a scheme or arrangement by failing to reduce the agreement relied upon to writing." *In re Beitzell & Co.*, 163 B.R. 637, 646 (Bkrtcy. D.Col.1993). *See also Timberland, supra* 932 F.2d at 48–49 (1st Cir.1991). This doctrine has been codified in 12 U.S.C. § 1823(e), which reads:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—(1) is in writing, (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) has been, continuously from the

time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e).

The *D'Oench, Duhme* doctrine and § 1823(e) serve the same purpose: to "prohibi[t] all secret agreements that tend to make the FDIC susceptible to fraudulent arrangements." *Timberland, supra,* 932 F.2d at 48. Both the doctrine and its codification allow bank examiners to rely exclusively on banking records to evaluate the assets of a failed bank in order to determine potential remedies. *W.T. Langley v. FDIC,* 484 U.S. 86, 91–92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). "Neither FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions." *Id.*

### 12 U.S.C. § 1823(e)

The plain language of § 1823(e) makes it inapplicable if there is a written tax-sharing agreement giving IBG ownership of the refund. The statute applies to "any asset acquired by (FDIC) under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution . . ." 12 U.S.C. § 1823(e). The term "asset" in this context involves a specific asset acquired by the bank and then subsequently turned over to FDIC as a receiver under §§ 1821(d)(2)(i) or 1823. *John v. Resolution Trust Corp.,* 39 F.3d 773, 776 (7th Cir.1994). The asset in question here is an income tax refund generated by the income and losses of a bank holding company and its banking subsidiaries. The term "asset" has been restricted in some cases to apply only to assets associated with "conventional loan" transactions. *See E.I. du Pont de Nemours & Co. v. FDIC,* 32 F.3d 592, 598 (D.C.Cir.1994). Nevertheless, we find that the refund is sufficiently connected to banking activities for the statute to apply in this instance. In addition, the parties themselves agree that the refund meets the statutory definition of an asset. This dispute centers around whether the refund was an asset of IBG or of FNB prior to FDIC receivership. If the refund was the property of IBG under an agreement, then that agreement, whether oral or written,

would tend to diminish or defeat FDIC's interest in the asset, and the statute would apply. The statute requires that any agreement that tends to have this effect must be in writing, and must have been an official record of the bank continuously from the time of its execution. 12 U.S.C. § 1823(e)(1), (4).

It is undisputed that a written agreement cannot be located or produced. IBG contends, however, that the written agreement must have been in the bank's records, and that FDIC had it destroyed. IBG argues that FRBB Reports corroborate the existence of the agreement, but offers nothing but speculation to suggest that FDIC destroyed the document. There is no evidence to suggest this. FDIC acquired FNB's documents when it took over as receiver for the failed bank. Some of FNB's assets were sold to Merchants Bank as part of the Caledonia National Bank's assets, and Merchants Bank "recycled" certain dated documents. Ms. Mary Jane Fredette, a branch president for Merchants Bank and the person responsible for the "recycling" efforts, states in her sworn Affidavit that she reviewed all the documents which were destroyed and that no tax sharing agreement was among them. IBG's contention that the documents were destroyed is mere speculation and conjecture and can not survive on its own as a disputed fact. Without the written agreement we are unable to find that IBG owns the refund.

### D'OENCH DUHME

IBG asserts that even if no written tax agreement exists, the terms of an oral agreement can be shown by IBG's history and practice of filing consolidated returns and arbitrarily allocating refunds. We reject this assertion as being inconsistent with the federal common law *D'Oench Duhme* doctrine.

In explaining the rule which emerged from *D'Oench Duhme,* the Third Circuit observed that federal law requires "the basic structure of the agreement (to be) apparent on the face of writings" in order to prevent banking authorities from having to conduct a "Lewis Carroll-like search." *Resolution Trust Corp. v. Daddona,* 9 F.3d 312,

319 (3rd Cir.1993). "Not only does the existence of the agreement have to appear plainly on the face of an obligation, but the basic structure of that agreement—*its essential terms*—must also appear plainly on the face of that obligation." *Id.*, (emphasis added). The writing requirements under *D'Oench* are admittedly less stringent than those under the statute, allowing most agreements whose terms are evident on the face of a document to survive as a claim or defense against FDIC. *See generally Beitzell, supra,* 163 B.R. at 648. The purpose of the rule requiring at least some writing is so that there can be no question as to the terms of the agreement, and so FDIC can value the assets by reviewing bank records and not be duped by spurious claims or the insertion of new terms. *E.I. du Pont, supra,* 32 F.3d at 598.

Here, no written agreement exists to identify the terms. IBG's practice of filing consolidated returns is at most evidence of an oral or implied tax sharing agreement. The only discernable terms of this agreement are that the tax allocation was arbitrary and in the sole discretion of IBG. While an implied tax sharing agreement has been found in certain circumstances, the mere fact that IBG may have filed a consolidated return for the 1983–1991 tax years "does not imply an allocation scheme". *Capital Bancshares Inc. v. FDIC,* 957 F.2d 203, 206 (5th Cir.1992). "The only reason for the tax refunds not being paid directly to the subsidiary is because the income tax regulations require that the parent act as the sole agent ... to handle all matters relating to the tax return." *In re Bob Richards Chrysler–Plymouth Corp.,* 473 F.2d 262, 264 (9th Cir.1973).

IBG argues that the notation in the FRBB Report recommending implementation of a written tax sharing agreement, and the later notation regarding the "approval" of a conforming agreement by IBG's board of directors show the existence of an agreement. This is insufficient. Even if we found that an agreement existed, which we do not, we have absolutely no evidence of what its terms were. With no written agreement to prove ownership of the tax refund, IBG's claim cannot defeat FDIC's interest. *Daddona* held that "even though the FDIC knew of the existence of a side agreement from the face of a writing, this side agreement could not serve as a defense because its terms were not set out in that writing." *Daddona, supra,* 9 F.3d at 320. So, whether or not FDIC was aware of a verbal tax sharing agreement between IBG and its subsidiaries is irrelevant. The law is clear. The agreement itself can not serve as a claim against FDIC because the terms of that agreement are not set out in writing.

## CONCLUSION

Accordingly, we hold that the tax refund belongs to FDIC as receiver. FDIC's Motion for Summary Judgment is granted and IBG's Motion for Summary Judgment is denied. FDIC is to settle an Order consistent with this Memorandum of Decision on five days notice.